**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Charles VENERE and Robert Anthony Perrotta, Defendants-Appellants.**

**No. 26428.**

United States Court of Appeals
Fifth Circuit.

Sept. 9, 1969.

Robert Josephsberg, Miami, Fla. (Ct. Apptd.), for appellants.

William A. Meadows, Jr., U. S. Atty., Theodore Klein, Asst. U. S. Atty, Miami, Fla., for appellee.

Before GEWIN, McGOWAN * and MORGAN, Circuit Judges.

McGOWAN, Circuit Judge:

Appellants were convicted in the United States District Court for the Southern District of Florida of conspiring to commit offenses against the United States i. e., possessing and passing counterfeit bills, and of the substantive crimes of possession and attempted uttering of such bills. 18 U.S.C. §§ 371, 472, and 2. A jury was waived, and the court heard the case on a stipulation of facts which included by reference the evidence taken on the hearing of a pretrial motion to suppress.

The errors now urged on this appeal are (1) certain identification evidence should not have been received and considered without a finding of a source independent of an allegedly improper pretrial confrontation, (2) the court fatally prejudiced appellants by denying their pretrial motions for separate trials and (3) incriminating statements made by appellants, while at liberty on bond before trial, to a Secret Service Agent in Boston were wrongfully received. Our examination of the record in the light of these contentions fails to convince us that any one of them is well taken and we affirm.

* Judge Carl McGowan of the District of Columbia Circuit, sitting by designation.

## I

On December 5, 1967, at about 9:00 P.M., the head cashier at the Dania (Florida) Jai Alai Stadium discovered two counterfeit $20 bills in the money taken in at the betting windows. The cashier told the head supervisor, Mr. Kolson, that the bills were in the money received from a ticket seller named Harrison. Kolson took the two bills immediately to Harrison, and was told by him that the bills had come from two men wearing blue "Miami Beach" sweatshirts who had placed bets at his window ten minutes earlier. Harrison testified that he had taken in only three $20 bills altogether, and he remembered the two individuals because of the distinctiveness of their sweatshirts and also because the two $20 bills they had given him were unusually crisp, which was the condition of the counterfeit bills.

Two security employees of the Stadium went out to find the two men described by Harrison. They were spotted immediately among the spectators, and were asked to go to the first aid room of the Stadium. They were left alone for a brief time in that room while the security employees went to report their presence there to Kolson and other Stadium officials. Kolson took Harrison immediately to the first aid room where Harrison confirmed that the two were the men who had given him the counterfeit bills. The Dania police were called, and, upon their arrival, advised appellants of certain of their rights. Venere declined to make any comment, but Perrotta stated that he had bought tickets earlier in the evening with $20 bills, although he did not know they were counterfeit. The police then arrested them both, and took them to police headquarters.

Promptly after arrival at police headquarters, and after renewed warnings but before any interrogation had commenced, Perrotta took Officer Hagen aside and told them that he, Perrotta, had hidden counterfeit $20 bills in the desk of the first aid room at the Stadium. An officer was sent back to find the bills, and he returned with 47 of them.

About 11 o'clock that evening Secret Service Agents arrived at police headquarters. They fully advised appellants of their rights. Venere refused to sign a waiver and declined to discuss the matter. Perrotta, contrarily, signed a waiver and made admissions to the effect that he had bought $1000 worth of counterfeit $20 bills, had passed one at a fruit stand before going to the Stadium, and had passed two at the Stadium betting window. He said that he alone was responsible.

The next day (Dec. 6) at about 1:00 in the afternoon, Secret Service Agents reinterviewed Perrotta, and he repeated his admissions of the previous evening in somewhat more detail but still implicating only himself. Later that same afternoon, at about 3:00, the agents again tried to speak with Venere. He still refused to discuss the crime with the agents beyond denying any complicity, but he did at that time sign a waiver after full warnings were given. Before leaving, the agents told Venere that he should tell the jailer to call the agents should he wish to talk. A few hours later, about six or seven in the evening, Venere had the jailer call the agents, and upon their return he, too, admitted his knowing participation in the crime.

Appellants were taken before the United States Commissioner on December 7, and released on bond.[1] An indictment

1. A considerable portion of the hearing on the motion to suppress was devoted to inquiry into why appellants were not presented sooner. The agents asserted that the District Court had by order limited the Commissioner's hearing to 9:00 A.M., and that, because of the lateness of their work on the evening of December 5, they were unable to make the 9 o'clock deadline on December 6. In view of the Government's decision not to use the December 6 statements and of the disposition we make of the other issues on this appeal, we do not find it necessary to pursue the question of whether these statements were inadmissible because of unnecessary delay in presentment.

was returned against them on December 14. At the arraignment, their counsel asked the court to give appellants permission to return to their homes in Boston pending trial, and that consent was given.

About six weeks later, on January 29, 1968, Venere appeared at the Secret Service Office in Boston. He told the receptionist that he had passed counterfeit notes in Miami, and wished to speak to someone in authority. The receptionist reported this to the Assistant Special Agent in charge, one Sweeney, who directed her to let him come in. He introduced himself to that officer, indicated his willingness to co-operate with the Government, and stated his desire to plead guilty in Boston and not to have to go back to Miami. The Agent stopped him at this point, fully advised him of his rights, and offered him a waiver form, which he signed.

Agent Sweeney testified that in the subsequent discussion Venere fully revealed his guilty participation. He also indicated his belief that he would get a lighter sentence in Boston than in Miami, and repeatedly inquired about the possibility of having the case transferred. Sweeney advised him that he should get a lawyer to counsel with him on these matters. Venere ended the interview by volunteering the information that he would get in touch with Perrotta, and that both of them would be in again.

Both did appear the very next afternoon. Sweeney gave them full warnings at the outset of the conversation, and

each signed a waiver. The Agent made a memorandum of their conversation, in the course of which each appellant again revealed himself as a knowing participant in the illegal transactions charged against them.

The trial court denied the motion to suppress in all respects, and also the motion of each appellant for a severance. Thereafter, the Government elected not to introduce at trial the incriminating statements made by appellants on December 6; and the stipulation of facts was drawn up with no reference to these disclosures other than the statement that "[T]he Government is specifically excluding from this trial any and all confessions made on the afternoon and evening of December 6, 1967."

## II

The stipulation of facts indicates that, immediately after appellants came to the first aid room in the Jai Alai Stadium with the security employees, Harrison came in with Kolson and said they were the men from whom he had received the counterfeit bills. Although appellants intimate in their brief that there is some indication in the record that appellants were then in the custody of the Dania police, we think the stipulation of facts suggests that the Dania police had not arrived as yet, and this interpretation has support in the testimony at the hearing on the motion to suppress.[2]

Thus we take the confrontation to have occurred when the management of

2. There is considerable confusion in the testimony as to just who was in the first aid room at varying times. Two Dania police officers were under the impression that Harrison had come in while they were there, but they did not know Harrison and their testimony is consistent with their having mistaken Harrison for the person who told them what Harrison had said. Kolson testified flatly that he and Harrison went immediately to the first aid room when informed that appellants were there, that Harrison and he left as soon as Harrison had said that appellants were the men he had described earlier, and that this was before the Dania police arrived. Harrison's testimony was consistent with Kolson's on this score, except that he mixed up his references to the Dania police and the Stadium security personnel. He eventually recognized that he was making this error, and his final testimony appears to be that only Stadium employees were in the first aid room when he made his brief appearance there. Of the appellants, only Venere, and not Perrotta, testified at the hearing on the motion; and Venere was asked no questions about the first aid room.

the Stadium was still engaged in investigating the counterfeiting incident. Ten minutes after the bills were passed, their counterfeit character had been discovered, a check had been made of the ticket sellers, and Harrison had responded affirmatively by identifying the two bills as the ones he had received from two men wearing the blue sweatshirts. With the two men fitting this description immediately located in the audience and asked to come to the first aid room, Harrison was asked to say if these were the two men he meant. He said that they were, and returned immediately to his ticket window to resume work. The Dania police were called. When they arrived, one of the two men told them that $20 bills, not known to be counterfeit, had been used to buy tickets. The police took the men immediately to the police station for booking.

It is now argued to us that Harrison could not identify appellants at trial because his prior confrontation with them in the first aid room was an infringement of appellants' rights to due process of law under the Fifth Amendment, Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and to counsel under the Sixth Amendment, United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). We are far from persuaded that either of these doctrines is applicable to the events here involved in a non-police context.[3] The course pursued by the management of the Stadium, as revealed by this record, was an eminently rational one, and well within the rights of a private citizen to respond to the apparent commission of a crime against himself.

*Stovall* and *Wade* were concerned with confrontations arranged by the police for persons in their custody after lawful arrest, and they are powerfully sug-

gestive of the desirability, if indeed not the necessity, that the police employ the device of the formal lineup for identification purposes. Where police custody is involved, the need for a formal lineup may not be circumvented by keeping the arrestee away from the station house while contriving confrontations of a more informal nature. See Rivers v. United States, 400 F.2d 935 (5th Cir. 1968). But the private citizen who intercepts a stranger fleeing from his house pursued by the screams of his wife surely does not disable his wife from identifying the defendant at trial by taking him back into the house to see if he was the cause of his wife's alarm. If it be true that even the police may, without violation of either the Fifth or Sixth Amendments, contemporaneously confront the victim with the suspect at the scene of the crime, Russell v. United States, 133 U.S.App.D.C. ——, 408 F.2d 1280 (D.C.Cir.), cert. denied, 395 U.S. 928 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969), how much more true is it that the victim may do so himself before deciding that he has the right man to turn over to the police.

We, in short, find nothing about the circumstances of Harrison's encounter with appellants in the first aid room which brings into play the *Stovall* and *Wade* limitations. But, even if we did, we would not believe reversal to be required. Appellants formulate their argument on this score in terms of the absence of any showing that Harrison's in-court identification would have a source independent of the first aid room meeting. We read Harrison's testimony, however, as strongly indicative of the fact that the first aid room confrontation contributed little, if anything, to his capacity to identify appellants. He testified at length as to how he remembered appellants as being the ones who

---

**3.** Although the Stadium security employees were apparently subject to some registration requirements under the Florida statutes, they do not appear to have been vested with any portion of sovereign authority, including the arrest powers of a police officer functioning in a public capacity. What they did here *vis-a-vis* appellants was solely in the service of their private employer and was not an exercise of public authority.

passed the two crisp $20 bills. His look at them in the first aid room was wholly perfunctory, lasting only a moment and he left immediately to go back to his job. It is clear that he regarded that incident as simply a re-iteration of what he had earlier related about the men who had passed the bills.[4]

## III

Appellants now assert that, since each of the admissions introduced into evidence incriminated the other co-defendant, it was error not to provide separate trials, as each had requested. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), is relied upon for the proposition that the prejudice inherent in this situation is so great as to make a joint trial unfair beyond the tolerance of the Fifth Amendment.

The factual premise of this point is, however, deficient. The Government did not place in evidence either of appellant's confessions of December 6. Perrotta's two admissions of December 5 not only failed to implicate Venere but affirmatively asserted that only Perrotta, and not Venere, had criminal responsibility. It is only the statement by the Secret Service Agent in Boston, reporting what both Perrotta and Venere told him in their meeting with him on January 30, that refers in the same document to each as having disclosed his own guilt and that of the other.

*Bruton* is concerned with the impact upon the nonconfessing defendant of the revelations about him made by his confessing co-defendant, and with the inability of the traditional limiting instructions to assure the differentiation by the jury between the two. That problem does not exist where each co-defendant is confronted by evidence of his individual admission of guilt. Thus, if it be assumed, as was the fact, that only the Perrotta confessions of December 5, 1967, and the Boston statement of January 30, 1968, were in evidence at the trial, appellants' objection to the failure to sever lacks the force necessary to compel reversal.

The point is, in any event, greatly attenuated by the circumstance that a jury was waived, a stipulation of facts agreed upon, and the issues of guilt or innocence of the acts charged determined by the court alone. The court had, at the pretrial suppression hearing, heard the testimony about all of the admissions, not just those which the Government decided to offer in evidence. In the face of this fact, and presumably in reliance upon the capacity of the judge, as distinct from that of the jury, to consider only the evidence offered at the trial, appellants agreed that, in the language of the stipulation, "this Honorable Court shall determine the guilt or innocence of [appellants] on the charges pending in this cause on the basis of the following testimony to be offered by the Government which the parties stipulate is the testimony in this cause." Although appellants in their stipulation renewed their objections to the admissibility of the December 5 and the January 30 confessions and to the identification of appellants by Harrison at trial, they did not renew the matter of a severance. This is quite understandable in view of the non-existence of the dangers to which Bruton is addressed. We see no occasion to make the severance issue the basis of a reversal on this appeal.

---

4. In addition to the distinctive sweatshirts, Harrison testified that he recalled that one of the two men was heavier than the other. When queried about that, he answered as follows:

  Q Did you notice the fact that one was heavier than the other when they bet at your window or when you identified them in the room?

  A Well, how would I know if I didn't know them at the window. How would I know them in the room?
  Q You noticed that at the window, then; is that correct?
  A Right. The reason I know this, one stepped back, I think the heavy-set one bet first with me to win. He stepped back and the thinner of the two came up and bet the second time.

## IV

There remains the question of the incriminating statements which were included in the stipulation. In the case of Perrotta, these are (1) the testimony of Officer Hagen of the Dania Police about Perrotta's volunteering the information to him that there were bills known by Perrotta to be counterfeit which he had hidden in the drawer of a desk in the first aid room of the Stadium, and (2) the statement signed by Perrotta which was introduced in the course of the testimony of Special Agent Chalfont of the Secret Service detail in Miami.

As to the former, Officer Hagen testified that, although both appellants made no admissions of guilt when they were briefly questioned in the first aid room and, indeed, denied possessing or passing counterfeit bills, when they arrived back at the station Perrotta immediately asked Hagen if he could speak to him privately. This was not in the context of any resumption of interrogation, but was a request by Perrotta made promptly after arrival at the police station. When Hagen granted this request, Perrotta told him that counterfeit bills had been hidden by him in a desk drawer in the first aid room. Hagen then sent Officer Barbiere of the Dania police back to the first aid room, and the latter returned in a short time with 47 counterfeit bills which he had found in the place indicated by Perrotta. No written statement of any kind was taken by the Dania police with respect to this incident.

Special Agent Chalfont testified that when he arrived at the Dania police station at about 11 o'clock in response to a call from the Dania police, Officer Hagen told him about finding the 47 bills as a consequence of the information volunteered to him by Perrotta. Chalfont then confronted the appellants and gave them the full *Miranda* warnings. Perrotta signed an acknowledgement of these warnings and represented that he did not want a lawyer. Perrotta then, speaking separately to Agent Chalfont, told him what he had told Officer Hagen about the counterfeit bills, and also said that he alone had knowingly passed the counterfeit bills to Harrison. A written statement was prepared setting forth what Perrotta told Chalfont, and Perrotta signed it after reading it over. Venere refused to talk to Agent Chalfont, or to Agent Cruz who accompanied him to the Dania police station.

In their brief and argument in this court appellants have not challenged the admissibility of Officer Hagen's testimony about Perrotta's admissions to him with respect to hiding the 47 counterfeit bills, nor the statement made by Perrotta to Agent Chalfont. They do assert that the January 30 statement given to Agent Sweeney in Boston was tainted by their December 6 statements taken during a period of allegedly unnecessary delay in presentment to a U. S. Commissioner under Rule 5(a), Fed.R.Crim.P. These, however, were the statements not offered in evidence by the Government at trial, and, as to Perrotta, the taint argument fails because his Boston statement adds nothing of significance to his admissions to Officer Hagen and to Special Agent Chalfont on the night of December 5. These last, we repeat, are not challenged in this court, and, we think from our reading of the record, for good reason because they appear to present neither a Rule 5(a) nor a *Miranda* defect.

In the case of Venere, the taint argument is founded upon his December 6 confession; and both appellants argue that the Boston statement of January 30 was forthcoming under circumstances constituting a violation of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1963). This latter argument is unavailing to effect reversal for Perrotta, since the *Massiah* violation, even if it be assumed to have occurred, would appear to be harmless error under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), the earlier valid incriminating statements of December 5 having assured his conviction. But Venere had given no earlier confession which can be assumed to be clearly valid, and we turn

therefore to the challenge made in his case to the Boston statement.

■ There is no dispute in the testimony as to the fact that Venere's approach to the Boston office of the Secret Service was his own idea, and that there was no element, as in *Massiah*, of connivance or prearrangement by the Secret Service. When he presented himself on January 29 in the Boston office, he explained his business to the receptionist by saying that he had passed counterfeit bills in Miami and he wanted to talk to the Agent in charge about it. He was given an audience with Agent Sweeney and proceeded to develop the story of his complicity for the purpose of seeing whether he could work out a transfer of the case to Boston, where he proposed to enter a plea of guilty in the avowed hope of receiving a lighter sentence than he would in Miami. He did not indicate to Sweeney that he was motivated in any way by the fact of the December 6 confession and a consequent feeling of helplessness in trying to establish his innocence. As he had already indicated to the receptionist, he purported to be a guilty man who wanted to discuss the availability of means by which he could signify that guilt to a court in Boston rather than to one in Miami.

Sweeney testified that his advice to him after hearing him out on January 29 was that he immediately consult a lawyer. Sweeney did not indicate that the transfer procedure was an alternative legally open to Venere, but rather told Venere that this was one of the things which he should get legal advice about. Sweeney closed the interview on this note, telling Venere that he should return only if consultation with a lawyer suggested to him that doing so would be in his interest. Venere returned the very next day with Perrotta for the purpose of making the statements which were reported by Sweeney in his memorandum of that conference.

It is argued to us that the Sweeney memorandum is inadmissible because it was made under a mistake of law as to the availability of the transfer procedure.[5] But, if mistake it was, it was one generated solely in the mind of Venere, and not one craftily planted there by the Government. Sweeney induced no such thoughts; rather, he cautioned Venere not to pursue the matter without getting the benefit of independent legal counsel. If Venere chose to ignore this caution and to persist in revealing his guilt through some reckless assumption of his own that it would advance his stated goal of lighter punishment, we know of no constitutional compulsion upon the Government not to make this revelation known to the court charged with the duty and responsibility of assessing guilt. *Manuel Samora, Jr. v. United States*, 406 F.2d 1095 (5th Cir., 1969). Indeed, if Venere had never returned to the Boston office, we think that Sweeney would have been obligated to come forward with his account of Venere's visit to the Boston office on January 29; and that testimony would, as to Venere, have been as powerfully probative of guilt as the statements he reiterated on his return visit the next day.

That part of Sweeney's testimony as to the January 29 visit serves at the least, in our view, to counter the taint argument by Venere founded upon his December 6 confession. The admissions made to Sweeney in that visit intrude a new element into the chain of events, and attenuate beyond recognition any psychological compulsion operating upon Venere by reason of the December 6 statement. When he made his further statement on January 30, he was only repeating in essence his admissions of the previous day, and we cannot say that

---

5. Sweeney testified that Venere told him that he wished to take advantage of the provisions of Rule 20, F.R.A.P. to effect the transfer of the case to Boston. It is evident that neither Venere nor Sweeney was familiar with the precise scope of Rule 20, but Venere in his testimony did not dispute Sweeney's assertion that he (Sweeney) did not tell Venere that a transfer could be effected but only that he (Venere) should consult a lawyer.

he was impelled to do so only because of what he had said on December 6. Even "granting establishment of the primary illegality," we cannot say on the record that the evidence objected to was come at by the Government "by exploitation of that illegality" rather than "by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

Appellants insist that, apart from taint, there was a clear violation of Massiah because Sweeney knew, or should have known, that Venere had a lawyer in Miami; and they point to a place in the transcript where that lawyer said that he had told the Secret Service people in Miami on December 7 or 8 that he did not want them talking to appellants without his knowledge. Sweeney, however, testified that he did not know on January 29 that appellants had ever been indicted yet, and certainly not that they had already retained counsel. This seems credible to us in the light of the unexpected nature of Venere's visit to the Boston office and the undisputed assertion of Sweeney that his concluding advice to Venere was that he go and get himself a lawyer forthwith.[6]

Insofar as Venere is concerned, therefore, we think the January 29 visit, and the admissions made in the course thereof, are critical. If the testimony of Sweeney on this score is free of defects going to admissibility, the admission of the Sweeney memorandum of the January 30 interview is harmless error at most, if error it be. We cannot believe

that that memorandum alone raises any question as to whether the court, given the January 29 incident, would have entertained a reasonable doubt as to Venere's guilt.

The convictions as to both appellants are

Affirmed.

---

6. It is argued to us, as it was to the District Court, that *Massiah* requires the automatic exclusion of all post-indictment incriminating admissions made in the absence of counsel, and that this is the necessary effect of decisions like Beatty v. United States, 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967) and McLeod v. Ohio, 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965). We think, however, that such a sweeping rule fails to take account of the precise factual circumstance involved in those cases, and

that generalization in this area without reference to the special facts in each record is hazardous. See United States v. Accardi, 342 F.2d 697 (2d Cir. 1965), cert. denied, 382 U.S. 954, 86 S.Ct. 426, 15 L.Ed.2d 359 (1965); United States v. Gardner, 347 F.2d 405 (7th Cir. 1965), cert. denied, 382 U.S. 1015, 86 S.Ct. 626, 15 L.Ed.2d 529 (1966); and United States v. Garcia, 377 F.2d 321 (2d Cir. 1967), cert. denied, 389 U.S. 991, 88 S.Ct. 489, 19 L.Ed.2d 484 (1967).