Ralph Edward **WILKINS**
**# 120002**

v.

**STATE OF MARYLAND.**

Civ. No. B–74–697.

United States District Court,
D. Maryland.

Oct. 1, 1975.

land, *Wilkins v. State,* 16 Md.App. 587, 300 A.2d 411 (1973), and, upon a writ of certiorari, review was had by the Court of Appeals of Maryland, *Wilkins v . State,* 270 Md. 62, 310 A.2d 39 (1973). Certiorari was denied by the Supreme Court, *Wilkins v. Maryland,* 415 U.S. 992, 94 S.Ct. 1592, .39 L.Ed.2d 889 (1974).

Now, Wilkins seeks a writ of habeas corpus from this court. The attorney who represented Wilkins at trial and on appeal has been appointed to represent him in this court, and he has performed his services well. Six issues are raised, and they shall be treated in the order set forth in petitioner's brief.

I.

Analogizing to *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L. Ed.2d 274 (1972), which overturned a one-year residency requirement for voter qualification, petitioner attacks the juror list from which Wilkins' jury was chosen. Petitioner notes that the jury array was drawn from voter registration lists and that, in 1971, Maryland had one-year state residency and six-month county residency requirements for voter registration. Petitioner then reasons that, if the voter rolls from which the jurors were drawn was constitutionally defective, then the juror list must also have been constitutionally deficient.

This syllogism fails even at the most rudimentary levels of logic. *Dunn v. Blumstein, supra,* was brought by new residents of Tennessee, who complained that the one-year residency requirement for voters interfered with their "right to travel," *id.* at 338, 92 S.Ct. 995, and that it denied them equal protection of the laws by infringing upon their fundamental right "to participate in elections on an equal basis with other citizens in the jurisdiction," *id.* at 336, 92 S.Ct. at 1000. The Supreme Court agreed with the new residents' arguments in *Dunn.* It does not follow from that decision, however, that all one-year residency requirements are unconstitutional. *Dunn*

Karl G. Feissner, Hyattsville, Md., for petitioner.

Bernard A. Raum, Asst. Atty. Gen., Baltimore, Md., for respondent.

## MEMORANDUM AND ORDER

BLAIR, District Judge.

On December 8, 1971, Ralph Edward Wilkins was convicted by a jury of murder in the first degree, for the shotgun slaying of one Thomas Magellan Lewis, on December 14, 1970. For this murder, Wilkins was sentenced to life imprisonment. Thereafter, Wilkins appealed to the Court of Special Appeals of Mary-

says nothing about one-year residency requirements for jurors. Furthermore, *Dunn v. Blumstein* only addresses the rights of the new residents who wished to vote—specifically, their right to travel and their right to equal protection of their right to vote. Wilkins' claim under the Sixth and Fourteenth Amendments hardly raises issues concerning his rights to travel and to equal protection of his right to participate in elections.

Turning from the *Dunn* decision, it should be noted that the juror selection plan for the district courts of the United States also requires that jurors reside in the district for one year prior to qualifying as jurors. *See* 28 U.S.C. § 1865(b)(1) (1975 Pocket Part). And, in this context, the one-year residency requirement for jurors has been upheld against constitutional attack. *See United States v. Perry*, 480 F.2d 147 (5th Cir. 1973); *United States v. Ross*, 468 F.2d 1213 (9th Cir. 1972), *cert. denied*, 410 U.S. 989, 93 S.Ct. 1500, 36 L.Ed.2d 188 (1973).

■■ Although evidence was introduced at trial concerning the percentage of adults who were not registered to vote, no evidence was adduced concerning the socio-economic composition of the registered and unregistered adults. And, this court agrees with the holdings of the Court of Appeals of Maryland and the Court of Special Appeals, to the effect that more than mere numbers must be shown to make out a valid attack on a juror selection plan. *Wilkins v. State*, 270 Md. 62, 310 A.2d 39, *aff'g*, 300 A.2d at 413–17. A defendant is only entitled to a selection process which is "reasonably designed to produce a fair cross-section" of the community. *See United States v. Guzman*, 468 F.2d 1245, 1247–48 (2d Cir. 1972), *cert. denied*, 410 U.S. 937, 93 S.Ct. 1397, 35 L. Ed.2d 602 (1973), *aff'g*, 337 F.Supp. 140, 143 (S.D.N.Y.1972). "[J]ury pools are not required to be a mirror im-

age of the community." *United States v. Ross*, 468 F.2d 1213, 1217 (9th Cir. 1972), *cert. denied*, 410 U.S. 989, 93 S. Ct. 1500, 36 L.Ed.2d 188 (1973). To establish a violation of his rights, the defendant must show the "systematic exclusion" of some "cognizable group or class of qualified citizens." *See United States v. Guzman, supra; United States v. Ross, supra.* No evidence of systematic exclusion of any cognizable group or class was introduced in the state court hearing on this issue, and there has been no suggestion that any such evidence exists.

■ Lastly, it has been held, and this court agrees, that it is reasonable "to assume that ordinarily voter registration lists are sufficient sources for jury selection lists." *United States v. Guzman, supra* at 1248. And, federal courts have long approved of the use of voter registration lists in the face of constitutional challenges. *See, e. g., United States v. Guzman, supra; United States v. Ross, supra; Camp v. United States*, 413 F.2d 419 (5th Cir.), *cert. denied*, 396 U.S. 968, 90 S.Ct. 451, 24 L.Ed.2d 434 (1969); *United States v. Caci*, 401 F.2d 664 (2d Cir. 1968), *cert. denied*, 394 U.S. 917, 931, 89 S.Ct. 1180, 22 L. Ed.2d 450 (1969); *United States v. Kelly*, 349 F.2d 720, 778 (2d Cir. 1965), *cert. denied*, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966); *United States v. Kroncke*, 321 F.Supp. 913 (D.Minn. 1970); *United States v. Greenberg*, 200 F.Supp. 382 (S.D.N.Y.1961). This court is not prepared to disapprove the use of voter registration lists as a source of juror lists.

## II.

■ Next, Wilkins charges that the judge's instructions to the jury concerning manslaughter, unconstitutionally shifted the burden of proof from the prosecution to the defendant on this issue. *See Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508

(1975). The state replies that the instructions merely placed on the defendant .

> the burden of moving forward with the evidence showing the elements which would reduce the felonious and unlawful killing from second degree to manslaughter, or showing that the killing was justifiable or excusable
>
> . . . .

(Trial Transcript at 366) and that the instructions kept on the state the burden of proving all elements of all possible offenses beyond a reasonable doubt. *See Wilkins v. State, supra,* 300 A.2d 411, 421–23. This practice, the state argues, is analogous to having a defendant move forward with some evidence of insanity before the sanity question is placed in issue, and that burden of raising an issue was not disapproved in *Mullaney. See Mullaney v. Wilbur, supra,* 421 U.S. at 701–703, nn. 28, 30, 31, 95 S.Ct. 1881. Further, the state argues, since Wilkins was convicted of first degree murder— for which the instructions unquestionably required proof by the prosecution of premeditation beyond a reasonable doubt —any error on manslaughter was harmless beyond a reasonable doubt.

This court does not reach the question of whether the trial court's instructions drew a clear distinction between the defendant's burden of moving forward with some evidence to reduce the crime to manslaughter, and the state's ultimate burden of proving all elements beyond a reasonable doubt. Deciding that question is unnecessary because this court agrees that any error in that respect was harmless beyond a reasonable doubt. *See Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); *Chapman v. California,* 386 U. S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

This court believes, and finds, that the instructions to the jury in no sense diluted the state's burden of proving beyond a reasonable doubt all of the elements of first degree murder, i. e., an unlawful killing, perpetrated in a manner which was "willful, deliberate and premeditated." *See* Trial Transcript at 360–68. The trial judge emphasized that first degree murder required proof that the killing was "deliberate, willful and premeditated" and "the State must prove beyond a reasonable doubt that the murder was deliberate, willful and premeditated." Transcript at 365–66. He went on to explain that

> premeditation means that the killing must be premeditated, planned in the mind beforehand, and a design to kill must have preceded the killing by an appreciable length of time—time enough to deliberate and form an actual willful intent to kill. There must be a showing that there was deliberation with enough time existing for deliberation and premeditation to convince you, the triers of the facts, that this purpose existed in the mind and the mind has become fully conscious of its design. Although the design to kill must precede the killing by some appreciable length of time, that time need not be long. If the killing results after hesitation or doubt, with sufficient time to overcome any doubt, a choice which results from thought is sufficient to characterize the crime as deliberate and premeditated, even though there is but a short time for this deliberation and premeditation.

Trial Transcript at 367. The trial judge also instructed the jurors on the possibility of a first degree murder conviction under the felony murder rule—a likely possibility given the evidence of armed robbery. Trial Transcript at 368. In addition, the elements of first and second degree murder were carefully distinguished from those for manslaughter. Manslaughter, the judge explained, would require "an involuntary killing, not done with the intention to take the decedent's life, but [which] resulted from a reckless and indifferent disregard for another person's life." Trial Transcript at 367. Also, he instructed the jurors that manslaughter is "the unlawful killing of a human being without

malice and is committed when a human being is killed unlawfully in sudden heat of passion caused by adequate provocation." Trial Transcript at 368.

Under those instructions, the jury convicted Wilkins of murder in the first degree. In finding Wilkins guilty beyond a reasonable doubt of the willful, deliberate and premeditated killing of the victim—or alternatively, of killing the victim during the perpetration of a robbery—the jury necessarily rejected, *beyond a reasonable doubt*, that the defendant acted recklessly without an intention to take a life or in the heat of passion. Phrased otherwise, in proving the elements of first degree murder beyond any reasonable doubt in the jurors' minds, the state necessarily disproved manslaughter beyond a reasonable doubt. Accordingly, the gist of *Mullaney v. Wilbur, supra,* that the state prove all elements of an offense beyond a reasonable doubt, is satisfied in fact. And, any arguable error in the jury instructions was harmless beyond a reasonable doubt. *Harrington v. California, supra; Chapman v. California, supra.*

Finally, it is important to note that no evidence whatsoever was introduced at the trial, which would have supported a rational finding of manslaughter, as opposed to second degree murder. On the other hand, the evidence strongly supported the jury's verdict of first degree murder. A clarification or change in the manslaughter instruction would have had no effect on the result. *Cf. Harrington v. California, supra.*

### III.

For his third point, Wilkins asserts that the trial court unconstitutionally refused to appoint an independent psychiatrist to examine Wilkins, at state expense. *See generally Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956).

There appear to be three aspects to this argument. First, there is the suggestion that a criminal defendant has a constitutional right to be examined by a psychiatrist of his own choosing. Second, there is the argument that the psychiatric examination at Clifton Perkins State Hospital was inherently inadequate because of its brevity. Third, Wilkins complains that the procedures by which he was examined at Clifton Perkins Hospital were experimental and were different from the procedures used in other parts of the state, and, therefore, they denied Wilkins equal protection of the laws.

■ Taking those points in order, the first—that a defendant has a constitutional right to be examined by a psychiatrist of his own choosing at state expense—has been rejected by the Supreme Court. *See Smith v. Baldi,* 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1953). *Accord Campbell v. Superintendent, Virginia State Penitentiary,* 386 F.Supp. 778, 779 (W.D.Va.1974). *See also Ruud v. United States,* 347 F.2d 321, 323 (9th Cir. 1965), *cert. denied,* 382 U.S. 1014, 86 S.Ct. 624, 15 L.Ed.2d 528 (1966). And, although the Fourth Circuit has expressed a preference for federal courts' appointing psychiatrists chosen or nominated by a federal defendant, it has only done so "under [its] general supervisory purview," in the interpretation of a federal statute. *See United States v. Davis,* 481 F.2d 425, 427–28 (4th Cir.), *cert. denied,* 414 U.S. 977, 94 S.Ct. 296, 38 L.Ed.2d 220 (1973); *United States v. Matthews,* 472 F.2d 1173 (4th Cir. 1973). *See generally* 18 U.S.C. § 3006A(e). Furthermore, in *United States v. Davis, supra* at 428, the Fourth Circuit stated that the preference for appointment of a psychiatrist of the defendant's choice, which was expressed in *Matthews, supra,* was not to be applied retroactively, i. e., prior to 1973. From the strong limitations in *Matthews, supra,* which were expressed by the court in *United States v. Davis, supra,* it appears safe to say that the Fourth Circuit disagrees with the suggestion that a defendant has a constitutional right to appointment of a psychiatrist of the defendant's choosing.

The fact is that Wilkins was examined by qualified psychiatrists and psychologists at a state hospital. The report of those doctors was made available to Wilkins and his attorney, and they could have been called by petitioner as witnesses at trial. The examiners were qualified professionals who rendered their professional opinions at the request of the court. The mere fact that their salaries were paid by the state no more impeaches their professional judgment than it would the professional judgment of a public defender or other appointed counsel. And, a criminal defendant certainly has no constitutional right to go expert shopping at state expense.

■ As to the second point raised in this regard—that the procedures employed by the Clifton Perkins Hospital's psychiatrists were inadequate—the psychiatrists' four-day examination procedures were the subject of an exhaustive pretrial evidentiary hearing. *See* Motions Transcript Vol. II. At that hearing four psychiatrists, including two hired by the petitioner and the psychiatrist who headed the examination of Wilkins, testified concerning the sufficiency of the examination of Wilkins

and of the four-day procedures generally.[1] There were splits of opinion on the sufficiency of the examination,[2] although all agreed on the qualifications of the psychiatrists who had examined Wilkins. Following the hearing, the trial judge filed a carefully written opinion in which he concluded,

> We have fully reviewed the evidence and evaluated the testimony presented and we believe that the record most amply shows that Mr. Wilkins was afforded a thorough examination as to his state of mind. It seems to us that the opinions expressed by Drs. Maki and Murphy may be summarized as being differing professional viewpoints on schools of thought from the viewpoints held by the Perkins Medical Staff. We do not believe their testimony casts any shadow of doubt on the thoroughness of the examination given Mr. Wilkins.

> It is our opinion that Mr. Wilkins has been furnished with competent expert services for the purpose of determining his sanity at the time of the crime and his sanity to stand trial. We therefore believe that it is not necessary that he be furnished with additional expert services of any nature

1. Dr. Sauer, who headed the team which examined Wilkins, testified from personal knowledge of the Wilkins examination. Motions Transcript at 137–68. He stated that Wilkins was at Clifton Perkins Hospital for four days, during which Dr. Sauer examined the petitioner on four occasions, a personal social history report was prepared, and a battery of psychological tests and a physical examination were administered. Further, the last of Dr. Sauer's meetings with Wilkins occurred at a staff conference at which Dr. Sauer presented a report to three psychiatrists and other staff members and those persons were able to talk with the petitioner. At the conference, after Wilkins left and the report had been made, the psychiatrists unanimously agreed that the petitioner was competent to stand trial and that, at the time of the offense, he had the requisite mental capacity to commit the crime charged.

The other psychiatrists, who testified at the hearing, were not personally familiar with the examination of Wilkins. They

based their testimony on their reading of the written report prepared by Dr. Sauer. While conceding the high qualifications and reputation of Dr. Sauer, two of these psychiatrists criticized the examination, and the other, Dr. Hamilton, strongly defended it.

2. Of the four psychiatrists, only Dr. Sauer had examined Wilkins to determine his sanity, and only he could express an opinion on those questions. At the motion hearing, Dr. Sauer confirmed his conclusion that Wilkins suffered an antisocial personality disorder, but that there was no evidence of mental retardation, of brain damage, of "halucinating or bizaare conduct," or of "severe neurosis." And, while he agreed with the defense attorney's choice of the labels "sociopath or psychopath," he adhered to his conclusion that Wilkins was not suffering from a mental disorder at the time of the offense which "would cause him to lack substantial capacity to conform his conduct to the requirement of law."

for the same purposes. Accordingly, the motion to retain an independent medical expert at State expense is hereby denied.

Those findings have full support in the record, and they are ones with which this court agrees. As those findings are fully supported by the record and as the issue was fully and fairly explored in the state evidentiary proceeding, no further evidentiary hearing on this issue is necessary or desirable. *See Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed. 2d 770 (1963). And, in fact, no such hearing has been requested.

From these materials, it is plain that, whatever minor differences of opinions might exist between psychiatrists on the sufficiency of the state hospital's examination, the pretrial psychiatric examination of the petitioner was not so deficient as to deny him due process of law.

■ Finally; the last point raised by the petitioner concerning the adequacy of the psychiatric exam is without merit. As long as his psychiatric examination was constitutionally adequate, he cannot complain that other persons, in other parts of the state, were examined by psychiatrists in a different manner. The procedures followed need not be uniform, provided that they are medically sound. Here, both the four-day pilot evaluation program and the longer evaluation program were reasonably designed to permit an accurate psychiatric judgment of a subject.[3] If anything, the state should be commended for having proceeded cautiously, in this limited

fashion, rather than jumping too quickly into the new procedure.

### IV.

■ Petitioner's fourth argument is that the standard Maryland instruction that the jury is the judge of both the facts and the law is unconstitutional. *See* Maryland Constitution, Art. XV, § 5. Precisely this argument was raised in *Giles v. Maryland,* 372 U.S. 767, 83 S.Ct. 1102, 10 L.Ed.2d 137 (1963), and the Supreme Court, by per curiam opinion, granted a motion to dismiss the appeal "for want of a substantial federal question." Moreover, this argument was carefully considered and rejected by the Fourth Circuit in *Wyley v. Warden, Maryland Penitentiary,* 372 F.2d 742 (4th Cir. 1967), *cert. denied,* 389 U.S. 863, 88 S.Ct. 121, 19 L.Ed.2d 131 (1967), *aff'g* 254 F.Supp. 727 (D.Md. 1966). Had the prosecution argued unconstitutional legal propositions to the jury, in order to subvert the valid instructions of the trial judge, this court might take a different view of this petition, but as no such improper arguments were made, the petitioner's argument is without merit.

### V.

Next, the petitioner urges that certain statements which he made in the presence of police should have been suppressed as the fruit of an illegal arrest. *See Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

---

3. According to Dr. Hamilton, who testified at the pretrial hearing, the Brief Admission Evaluation Program was an experimental program under which persons from certain counties of the state were examined over a four or five day period (on the average) rather than the former, standard 60-day period. He testified that the Brief Admission Evaluation Program was begun, because it had become apparent to those who were running the hospital that, under the longer program, a great deal of a subject's time was spent simply living and accepting room

and board. He further stated that there is no "magic time period" which would be necessary and that considerable effort went into the presumptive conclusion that four days would be long enough. Dr. Hamilton also testified that, if more than four days were necessary in a given case, additional time would be requested from the court. And, he expressed the opinion that the depth of the four-day evaluation program was equal to or superior to what a private psychiatrist could do. *See* Motions Transcript 68–72, 80–85.

At a suppression hearing, held during the trial, out of the jury's presence (*see* Trial Transcript 250–70 and, also, 301–16 and 326–29), it was developed that on February 14, 1971 Detective John Rossi went before a Justice of the Peace to obtain a warrant for the arrest of the petitioner on the charge of murder. The warrant was issued upon the detective's verbal oath that its contents were true, and no written affidavit accompanied it. Late on the next night, February 15, 1971, petitioner voluntarily turned himself in to the Seat Pleasant police station. Detective Rossi, who was in charge of the case, came to the station, upon learning of Wilkins' presence, identified himself and read the petitioner his *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Rossi testified that Wilkins "appeared to be normal," was "fully aware of what was going on," and "was very calm and very receptive to what was taking place." Following advice of his rights, Wilkins stated that he wished to telephone his mother and that Rossi could sit by and listen, while he explained to his mother his part in the crime. When, after several busy signals, Wilkins got through to his mother, he made a statement which placed himself at the scene of the crime in connection with a robbery, even though he did not acknowledge pulling the trigger. Following the telephone conversation, which lasted approximately 15–20 minutes, the petitioner's brother, Clyde Wilkins, came to the station. Then, in Clyde's presence, the petitioner consented to make a written statement, signed a waiver-of-rights form, and made a handwritten statement. Clyde Wilkins signed both the waiver form and the statement as a witness. No witnesses other than Rossi were called by prosecution or defense to testify concerning the admissibility of Wilkins' statement.

The trial judge, following Maryland precedent, held that, whether or not the arrest was illegal, the reading of *Miranda* warnings, purged the statement of any illegality. *See* Trial Transcript at 284–85.

The posture adopted by the judge has recently been rejected by the Supreme Court in *Brown v. Illinois, supra*. There, the Supreme Court held that *Miranda* warnings did not *per se* purge any subsequent statement of the primary taint of a prior illegal arrest. *Id.*, 422 U.S. at 605, 95 S.Ct. 2254. However, the Court reaffirmed that the issue to be determined is whether the statement, which followed the illegal arrest, "was sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Id.*, 422 U.S. at 599, 95 S.Ct. at 2259. *See Wong Sun v. United States, supra* at 486, 83 S.Ct. 407. And, again the Court rejected any rigid "but-for" test in this area. *Brown v. Illinois, supra*, 422 U.S. 599, 95 S.Ct. 2254; *Wong Sun v. United States, supra* at 487–88, 83 S.Ct. 407.

▆▆ In this case it is not necessary for this court to decide whether the warrant was valid. Even if it were invalid, it is clear from the petitioner's actions that his statement made to Detective Rossi and his mother was sufficiently an act of the free will to purge it of the taint of any invalidity in the arrest warrant. Likewise, his repetition of his statement in writing, in the presence of his brother, was clearly an untainted act of the free will. Wilkins' actions were at least as much the untainted products of his free will as were those of Wong Sun, *see Wong Sun v. United States, supra* at 491, 83 S.Ct. 407. *See also United States v. Owen*, 492 F.2d 1100, 1106–07 (5th Cir.), *cert. denied*, 419 U.S. 965, 95 S.Ct. 227, 42 L.Ed.2d 180 (1974); *United States v. Fallon*, 457 F.2d 15, 18–20 (10th Cir. 1972); *United States v. Venere*, 416 F.2d 144, 150–51 (5th Cir. 1969); *Leonard v. United States*, 391 F.2d 537 (9th Cir. 1968). Accordingly, Wilkins is not entitled to relief on this point.

## VI.

Lastly, petitioner presents an objection to the trial court's amending the indictment to correct a typographical error in the date of the alleged murder. The change was from December 14, 1971 to December 14, 1970. Since the Grand Jury returned the indictment in March 1971, and the trial was begun on December 6, 1971, it is patent that the error was strictly typographical. Even in federal court, in which the right to be indicted by a grand jury is well established, such corrections of form are permissible. *See Stewart v. United States*, 395 F.2d 484 (8th Cir. 1968); *United States v. Stapleton*, 271 F.Supp. 59 (D. Tenn. 1967); 1 Wright, *Federal Practice and Procedure*: Criminal § 127 at 273–4 (1969). In a habeas corpus attack on a state practice a federal court surely cannot take a more stringent view. The argument is without merit.

## VII.

For the foregoing reasons, it is this 1st day of October, 1975, ordered that the petition for writ of habeas corpus be, and hereby is, denied.