**John FORD, Appellant (Defendant below),**

v.

**The STATE of Indiana, Appellee (Plaintiff below).**

No. 3–778A189.

Court of Appeals of Indiana, Third District.

March 12, 1979.

John R. Kouris, Munster, for appellant.

Theo. L. Sendak, Atty. Gen., Gordon E. White, Jr., Deputy Atty. Gen., Indianapolis, for appellee.

STATON, Judge.

A jury found John Ford guilty of the offenses of Assault and Battery with Intent to Kill and First Degree Burglary.[1] He was then sentenced to the Indiana Department of Corrections for concurrent terms of two (2) to fourteen (14) years and ten (10) to twenty (20) years for his respective crimes. Ford appeals from his convictions and raises the following issues for our review:

(1) Whether Ford's due process rights were violated when the trial court admitted into evidence the photographic and in-court identifications of the defendant by victim Genevieve Gray?

(2) Whether the trial court erred when it refused to admit the defendant's hospital records into evidence?

(3) Whether the trial court erred when it admitted the rebuttal testimony of an investigating police officer into evidence?

(4) Whether the defendant's right to counsel was violated when the trial court denied defense counsel's motion for limited withdrawal from the case?

We find no error, and we affirm.

## I.

### Identifications

A brief statement of the facts is necessary to an understanding of our disposition of this issue. At approximately 3:30 A.M. on March 11, 1973, James and Genevieve Gray were awakened by noise from the rear of their home at 2400 Harrison Street in Gary, Indiana. While James got a gun and went to the back door in the kitchen, Genevieve peered through a bedroom window at the back porch, where she observed a stranger. She then joined her husband James and implored him not to open the door.

For approximately five minutes, the man outside their home pleaded with the couple

to "open the door," that "there has[d] been a burglary in the neighborhood," and that he was "a police officer." During this period, the couple observed the man through a 10″ by 10″ window in the door. When they refused to heed his request, the man kicked the door partially open and began shooting at James, who returned the gunfire. After James shot the would-be intruder in the hand, the man fled.

Contemporaneously, Gary Police, who were responding to a call from Genevieve Gray, encountered a man fleeing from the Gray residence as they approached the home. A gun battle ensued, during which Police Officer Wallace James noticed that the man appeared to have blood on his hand. Although the police were unable to apprehend the man at that time, Officer James subsequently encountered him in the emergency room at Gary Mercy Hospital, where he was identified as John Ford.

Both Ford and James Gray, who had been injured in the shoot-out at the Gray residence, were admitted to Gary Mercy Hospital. While Genevieve Gray was visiting her husband the following afternoon, a friend employed at the hospital informed her that the man who had shot her husband was in custody on the floor "right below." On her own initiative, Genevieve went to Ford's room and confronted him about the incident at the Gray residence.

Genevieve selected Ford's photograph from a display of six photographs the next day at police headquarters as the likeness of the man who had shot her husband and had attempted to break into the Gray residence. Over Ford's objection, this identification, as well as Genevieve's in-court identification of Ford, was introduced into evidence at trial as proof of Ford's culpability for the acts charged.

It is Ford's contention that the admission of these identifications constitutes reversible error. Ford maintains that

1. IC 1971, 35–13–2–1 (Burns Code Ed.), which defined Assault and Battery with Intent to Kill, and IC 1971, 35–13–4–4 (Burns Code Ed.), which defined First Degree Burglary, were re-

pealed by Acts 1976, P.L. 148, § 24, effective October 1, 1977. The offenses for which Ford was charged were committed on March 11, 1977.

the photographic and in-court identifications of him by Genevieve Gray were the products of the one-on-one confrontation at Gary Mercy Hospital, which occurred in circumstances which created a substantial likelihood of irreparable misidentification.[2] According to Ford, the one-on-one confrontation at the hospital tainted the subsequent identifications of him by Gray and denied him his due process rights guaranteed by the 14th Amendment.

We disagree with Ford's conclusion that the facts presented raise a constitutional issue. Due process grounds, of course, form the basis for the rule laid down in *Stovall v. Denno* (1967), 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 and its progeny[3] that the identification of a defendant subsequent to an unconstitutionally suggestive confrontation is inadmissible, so long as no "independent basis" for the identification exists. In order to invoke the rule, however, the evidence must reveal that law enforcement agencies or the prosecution engineered the confrontation between the defendant and the witness. *United States v. Venere*, 416 F.2d 144, 148 (5th Cir. 1969). The rule established in *Stovall, supra,* is predicated on the due process clauses of the Fifth and Fourteenth Amendments, which protect the accused from abuse of his or her procedural rights by the State. Accordingly, in cases where the evidence has not revealed that the State arranged the confrontation under attack, courts have refused to apply the *Stovall, supra,* rule. *United States v. Venere, supra*; *Griffin v. State* (1976), Ind. App., 357 N.E.2d 917; *People v. Finch* (1970), 47 Ill.2d 425, 266 N.E.2d 97. The evidence reveals that Genevieve Gray was present in Ford's hospital room on her own initiative, and there is no indication that the

State was even aware of her presence there.[4]

Even if the State had arranged the confrontation, however, the evidence reveals that Genevieve Gray had an independent basis for her photographic and in-court identifications of Ford. Throughout the incident at the Gray residence, lights illuminated the kitchen, back porch and backyard of the home. Genevieve Gray observed the would-be intruder for approximately one minute from the bedroom and for approximately five minutes through the back door. During this latter observation, Genevieve testified that a distance of only six to twelve inches separated her from the attacker. She stated that she could see the man clearly at that time, and that she looked "at everything about him, his mustache and everything." This evidence establishes an independent basis for her photographic and in-court identifications of Ford, regardless of the effect of the one-on-one confrontation at the hospital.

II.

Hospital Records

■ At trial Ford attempted to introduce into evidence medical records concerning his hand injury which were compiled by personnel at Gary Mercy Hospital. The attempted introduction of the records occurred during defense counsel's examination of Dr. Peter Gutierrez, who had examined both Ford's hand and the medical records in order to form an opinion of the nature, extent, and type of wound suffered by Ford. Gutierrez had not, however, participated in or overseen the compilation of the documents. The trial court rejected

2. Those circumstances which Ford asserts created the substantial likelihood of mistaken identification include the fact that Genevieve was informed that the *assailant* (not the suspect) was in a particular hospital room, Genevieve's admission that the trauma of the attack still influenced her behavior at the time of the confrontation, and the fact that the defendant was under guard in the hospital.

3. For applications of *Stovall v. Denno, supra,* in Indiana, see *Parker v. State* (1976), 265 Ind.

595, 358 N.E.2d 110; *Carmon v. State* (1976), 265 Ind. 1, 349 N.E.2d 167; *Swope v. State* (1975), 263 Ind. 148, 325 N.E.2d 193; *Vicory v. State* (1974), 262 Ind. 376, 315 N.E.2d 715.

4. Vague references appear in the record to the fact that Ford was under "guard" in the hospital. There is no indication, however, that the "guards" played a role, either actively or passively, in the one-on-one confrontation between Ford and Genevieve Gray.

Ford's contention that the records were admissible as "business records" on the basis that the authenticity of the documents had not been established. Ford contends that the trial court erred in its conclusion that the documents were inadmissible.

The "authentification" of a document is one foundational prerequisite to its admission under the "business record" exception to the hearsay rule. *American United Life Insurance Company v. Peffley* (1973), 158 Ind.App. 29, 36–37, 301 N.E.2d 651, 656. To satisfy the requirement, the party who offers proof as a "business record" must call either the entrant or the person under whose supervision the document was kept to establish the remainder of the foundation necessary to qualify the document for admission under the "business record" exception.[5] *Id.*

Ford maintains that Dr. Gutierrez's testimony was sufficient to authenticate the medical records. In support of this contention, he relies on *Howard v. State* (1976), 264 Ind. 275, 342 N.E.2d 604. In *Howard, supra,* the Supreme Court held that an X-ray had been properly authenticated by the testimony of a surgeon that the X-ray had been exposed in his presence and was immediately developed and brought to him. 264 Ind. at 283, 342 N.E.2d at 608. There is no evidence in the instant case to indicate that Dr. Gutierrez played a similar supervisory role in the compilation of Ford's medical documents. Accordingly, the trial court did not err when it denied the admission of the documents on the basis that Gutierrez was not capable of authenticating the records.

### III.

#### Rebuttal Testimony

At trial Ford tendered an alibi defense to the charges against him. He testified on his own behalf that the gunshot wounds to his hand were sustained when he was attacked by two unknown persons. On cross-examination he stated that the assailants did not look in his pockets, ask him for anything, or attempt to take anything from him. The State then posed the following question to Ford:

"Mr. Ford, did you tell anybody—I direct your attention to an earlier time—did you ever tell anybody that someone tried to rob you when you got shot?"

Ford responded:

"No, I don't remember."

The State then called as a rebuttal witness Gary Police Officer Ronald Fleming, who had questioned Ford at Gary Mercy Hospital on March 12, 1977. The following question was propounded to Fleming:

"And can you tell us what he told you in regards to how he obtained those injuries?"

Over defense counsel's objection that the subject-matter was not "impeaching testimony or proper rebuttal,"[6] Fleming was allowed to answer:

"He told me that he had been robbed and consequently shot as a result of a struggle with the person who had robbed him."

Ford here reasserts his contention that the admission of Fleming's testimony was erroneous. In his appeal brief, he supports his contention with the specific argument that the substance of Fleming's rebuttal testimony concerned matters collateral to the issues before the trial court. Ford relies on *Farley v. State* (1962), 243 Ind. 445, 185 N.E.2d 414 to support his claim that a prior inconsistent statement of a witness is subject to impeachment only when its sub-

---

5. To qualify as a "business record," the document must be "an original or first permanent entry, made in the routine course of business, at or near the time of the recorded transaction, by one having both a duty to so record and personal knowledge of the transaction represented by the entry." (Citations omitted.) *American United Life Insurance Company v. Peffley, supra.*

6. We note that a more effective objection would have been that the proper foundation for impeachment had not been laid. The interrogation of Ford quoted in the text, which apparently constitutes the foundation for the impeachment, lacks the specificity required by *Gradison v. State* (1973), 260 Ind. 688, 300 N.E.2d 67. Ford's failure to raise this basis in the trial court constitutes waiver. *Wilson v. State* (1970), 253 Ind. 585, 255 N.E.2d 817, 819.

stance concerns matters material to the issues before the court.

We do not address the contention raised by Ford. Notwithstanding the specificity of his argument on appeal, the objection tendered to the trial court at the time the rebuttal testimony was offered was general in nature. A general objection to the admissibility of evidence at the trial court level constitutes a waiver of the right to challenge the admission of the evidence on appeal. *Gurley v. State* (1976), 264 Ind. 552, 556, 348 N.E.2d 16, 19.

## IV.

### Right to Counsel

Following the trial court's entry of judgment on the guilty verdicts rendered by the jury, but prior to sentencing, Ford's trial counsel received information which revealed that the Federal Bureau of Investigation was seeking Ford's cooperation in an action against a former client who had discussed the pending federal matter with him. Based on his conclusion that the continued representation of Ford would constitute a conflict of interest that would violate provisions of the Code of Professional Responsibility,[7] defense counsel filed a "Motion for Limited Withdrawal" from the case. The motion was denied by the trial court. Based on those same ethical considerations which had prompted his motion to withdraw, defense counsel did not address the court in Ford's behalf at the hearing wherein Ford was sentenced. Ford here contends that the trial court's refusal to grant his defense counsel's motion to withdraw operated to deny him his constitutional right to effective representation by counsel.

Regardless of the merits of Ford's contention, we are unable to perceive how Ford was prejudiced by the fact that his counsel did not address the court at the sentencing hearing.[8] Ford was sentenced to serve concurrent terms of not less than two (2) nor more than fourteen (14) years and not less than ten (10) nor more than twenty (20) years for his respective convictions for Assault and Battery with Intent to Kill and First Degree Burglary. In IC 1971, 35–7–1–1 (Burns Code Ed.), the legislature denied the trial court the power to grant probation on a conviction for the latter offense, which was the subject of the more severe sentence received by Ford. Accordingly, the inability of his lawyer to address the court could not affect the length of Ford's incarceration. Ford's sentencing was in fact little more than a ministerial ceremony. *Accord, Vitoratos v. Maxwell,* 351 F.2d 217 (6th Cir. 1965); *Thomas v. Maxwell* (1963), 175 Ohio St. 233, 193 N.E.2d 150.

Affirmed.

HOFFMAN, J., concurs.

GARRARD, P. J., concurs in result.

---

7. The motion to withdraw was predicated on Code of Professional Responsibility, Disciplinary Rule 2–110(B)(2), which compels a lawyer to withdraw from employment if he or she is aware that continued employment will result in a violation of a Disciplinary Rule. Ford's counsel feared his continued representation would violate Disciplinary Rule 5–105, which prohibits a lawyer from continuing to represent a client when circumstances affect the lawyer's ability to exercise his or her independent professional judgment.

8. In this regard, Ford has provided no guidance to the Court. He merely has tendered the bald assertion that the denial of right to effective representation prejudiced him.