UNITED STATES of America

v.

**Antonio Romero MORQUECHO, Bacafacio Saenz De Leon, Oscar Gonzalez, Ramon Medina Martinez and Robert Earl Smith.**

Crim. No. L–79–133.

United States District Court,
S. D. Texas,
Laredo Division.

July 6, 1979.

Emilio Davila, Jr., Asst. U. S. Atty., Laredo, Tex., for United States of America.

Julio A. Garcia, Laredo, Tex., for Antonio Romero Morquecho and Bacafacio Saenz De Leon.

Pat Maloney, Jr., San Antonio, Tex., for Ramon Medina Martinez.

Harry Louis Zimmermann, Dallas, Tex., for Robert Earl Smith.

## MEMORANDUM AND ORDER

KAZEN, District Judge.

The Defendants are charged in a seven-count indictment, Count One of which charges all five Defendants with conspiracy to distribute a quantity of cocaine in violation of 21 U.S.C. § 841(a)(1). Count Four charges Medina-Martinez and Smith with a substantive violation of 21 U.S.C. § 841(a)(1) allegedly occurring on May 11, 1979. Count Five charges Romero-Morquecho and Saenz-De Leon with a substantive violation of 21 U.S.C. § 841(a)(1) allegedly occurring on May 12, 1979. Counts Three, Six and Seven pertain only to Defendant Oscar Gonzalez, who has not appeared in this cause. Count Two alleges a separate conspiracy between only Gonzalez, Saenz-De Leon and Medina-Martinez, allegedly occurring on May 9, 1979.

Defendants Romero-Morquecho, Saenz-De Leon, Medina-Martinez and Smith have each been arraigned and are represented by attorneys. All four filed a Motion to Suppress Evidence and a hearing was heard in open court on June 15, 1979. The conspiracy charged in Count Two of the Indictment was not involved at the Motion to Suppress hearing and therefore the testimony related only to Counts One, Four and Five.

All four Defendants have also filed motions for Bill of Particulars. In addition, Defendants Romero-Morquecho and Saenz-De Leon have filed a Motion for Severance, asking that they be tried apart from the other two Defendants. Defendants Romero-Morquecho and Saenz-De Leon have also filed a "Motion for Separate Hearing" asking the Court to conduct a separate hearing to determine the admissibility of any co-conspirator's statements which the Government intends to introduce against them at the trial.

## FACTS SURROUNDING ARREST OF MEDINA–MARTINEZ AND SMITH

On May 9, 1979, an undercover DEA agent purchased an ounce of cocaine from Oscar Gonzalez in Laredo, Texas. Gonzalez indicated to the undercover agent that his source of cocaine was "Ramon". DEA agents observed Gonzalez meeting with Defendant Ramon Medina-Martinez both before and after the cocaine transaction of May 9. On May 11, Oscar Gonzalez told the undercover agent that his cocaine source was leaving Laredo in order to conduct a cocaine transaction of some kind. That same day, DEA agents personally observed Ramon Medina-Martinez purchase a ticket from Texas International Airlines at the Laredo Airport to travel to Dallas. All of this information was communicated to Special Agent Lloyd Clifton in Dallas who in turn gave the information to Special Agent Russell Pfeiffer. The Laredo office also gave a detailed personal description of Medina-Martinez to the Dallas office, which description was also conveyed to Pfeiffer.

Sergeant Gary Vineyard of the Texas Department of Public Safety (DPS) stationed at the Dallas-Ft. Worth Airport was also briefed by Special Agent Clifton and later by Pfeiffer himself and his aid was enlisted on the case. Clifton advised him that when Medina-Martinez passed through inspection upon his departure from the air-

port in Laredo, he was carrying only an attaché case containing clothing and some toilet articles. Sergeant William Glenn of the DPS in Dallas was also assisting in the investigation.

Agent Pfeiffer had received his briefing from Agent Clifton at approximately 3:00 P.M. on May 11. At approximately 4:10 P.M. that same day, he was at the Dallas-Ft. Worth Airport and saw Defendant Medina-Martinez deplane. He matched the description given and was carrying only the attaché case. After deplaning, Medina-Martinez first went to the washroom. He then made a phone call to someone and spoke generally in the Spanish language. Agent Pfeiffer does not understand Spanish and could only hear the phrase "aqui, aqui, aqui" (meaning here, here, here) and also heard the term "Gate 14". Medina-Martinez then ate a meal and walked to the airport lobby. He was then seen getting into a ticket line two different times. Each time shortly before his turn would arrive at the counter, he would leave the line. For a time he looked out of the windows and generally wandered around the terminal. He was observed from approximately 4:10 P.M. until 6:00 P.M. At this time, he apparently saw something out of the window and "darted" out of the terminal. Pfeiffer followed and saw a 1978 Thunderbird automobile double-parked outside. In the car at the driver's seat was a man later identified as Defendant Smith. There was also a woman and at least one child in the car. Medina-Martinez got in the front seat and the car traveled towards the north exit of the airport. The automobile at some point then made a U-turn and headed back toward the Braniff Airline terminal. Smith was driving the car. The car was stopped and both Smith and Medina-Martinez went into the Braniff terminal. As he exited the Thunderbird at the Braniff terminal, Medina-Martinez was now seen carrying a second case which appeared to be in the nature of a small toilet kit. The two men walked to Gate 7 and went to the ticket agent and thereafter sat in the waiting seats of the gate. A short time later they entered the line as if to board a flight.

Agent Vineyard added that while he and Pfeiffer were following the Thunderbird on its indirect journey from the Texas International terminal to the Braniff terminal at the Dallas-Ft. Worth Airport, he saw the two men in the Thunderbird make what he described as "furtive movements" indicating that their heads and shoulders were ducking periodically, giving him the impression that some kind of unusual business was going on in the vehicle.

When the officers saw Smith and Medina-Martinez stand up as if to enter the line of departing travelers at the Braniff terminal, they approached and Agent Pfeiffer identified himself as a Federal Agent. Glenn and Vineyard were present and by this time possibly Agent Clifton was present. Pfeiffer asked the two suspects to identify themselves. Defendant Medina-Martinez identified himself as "Ramon Medina". When asked to provide some evidence of identity he furnished his airline ticket. Defendant Smith apparently properly identified himself but when asked for documentation indicated that he had nothing to provide and that he had left his wallet at home. Pfeiffer stated that he was investigating the possibility of a narcotics transaction and asked whether the parties were in possession of any narcotics. Medina-Martinez promptly denied having any narcotics and offered to open his attaché case to prove this. He voluntarily did so and upon opening the case, a large quantity of currency was seen, totaling some $45,000.00. The currency was spread out along the top of the contents of the attaché case in plain view as the case was opened. Medina-Martinez explained that he had come to Dallas to purchase a truck from Smith but that the deal had fallen through. Defendant Smith agreed that this was what the two men were doing. Smith and/or Medina-Martinez also indicated that they had arrived at the Braniff terminal in a taxicab and specifically denied any connection with the Ford Thunderbird automobile that was still outside the terminal and in which the agents had personally observed the two men arrive. At this point, Officer

Vineyard arrested Smith for having no driver's license. He then went outside the terminal, accompanied by Officer Glenn, to check the Thunderbird automobile. When he arrived at the vehicle, it was parked along a curb at a three-minute zone. The motor was running and the adult woman was seated in the driver's seat. The windows were up. Vineyard tapped on the window and displayed his badge. The woman responded promptly. The door was opened and she started to get out. As soon as she pivoted in order to exit the automobile, Vineyard could plainly see a black object on the floor where her feet had been. He picked up the object and saw that it was a plastic garbage bag rolled up tightly and bound with rubber bands. It was approximately eight to twelve inches long. It was obvious that the bag had some contents but the nature of the contents could not be determined from the outside. Vineyard testified that in his seven years' experience he had found it quite common for plastic bags of this nature to contain contraband drugs. Vineyard immediately opened the bag and found smaller packages with a substance subsequently determined to be cocaine.

## CONCLUSIONS OF LAW CONCERNING ARREST OF MEDINA–MARTINEZ AND SMITH

◼ The Court finds that there was sufficient basis for Agent Pfeiffer to make the initial investigative stop of Medina-Martinez and Smith at the Braniff terminal in the Dallas-Ft. Worth Airport. At that point, Agent Pfeiffer had the following facts and information: That Oscar Gonzalez had sold cocaine to an undercover DEA agent in Laredo two days earlier; that Gonzalez had identified his source of cocaine to be Ramon; that immediately before and after the cocaine transaction, Gonzalez had been seen in the company of Ramon Medina-Martinez, that Gonzalez subsequently indicated to the undercover agent that his source was leaving town on a cocaine transaction; that Ramon Medina-Martinez did in fact leave Laredo via commercial airline that same day; that he left carrying only

an attaché case; that he arrived in Dallas and promptly made a phone call; that he waited around the terminal for nearly two hours, passing some of the time in an unusual fashion such as standing in ticket lines without intending to buy tickets; that at approximately 6:00 P.M. he suddenly darted out of the terminal to get into a Ford Thunderbird automobile being driven by Defendant Smith; that the automobile took off at first heading for the exit but then made a U-turn and drove over to the terminal of another airline at the same airport; that the male occupants of the vehicle were making furtive movements while in the car; that Medina-Martinez and Smith then got in line at the ticket counter in the Braniff terminal; that they then took their seats in the waiting area and shortly thereafter stood up as if either or both of them were going to get on a departing flight. The Court believes that the foregoing facts gave Agent Pfeiffer the right to make an investigative stop. It is clear that probable cause was not required at this point but instead all that was necessary was enough facts to create a reasonable suspicion. *United States v. Hall,* 557 F.2d 1114 (5th Cir. 1977).

◼ After Agent Pfeiffer asked for identification and indicated that he was looking for narcotics, the evidence indicates that Medina-Martinez immediately volunteered that he had no narcotics and that he would open his attaché case and show it to Pfeiffer to prove that fact. To the extent therefore that the examination of the contents of the attaché case can even be characterized as a "search", the Court finds that it was done by consent. *United States v. Fogelman,* 586 F.2d 337 (5th Cir 1978); *United States v. Hall* 565 F.2d 917 (5th Cir. 1978). The opening of the attaché case disclosed an unusually large amount of cash spread out in plain view on top of the clothing and other articles which cash had apparently not been in the case when Medina-Martinez left the Laredo airport a few hours earlier. The men then pointedly denied having come to the Braniff terminal in the Ford Thunderbird automobile and

Agent Pfeiffer had personal knowledge that their story about taxicab transportation was a lie. Under somewhat similar circumstances, it has been held that it would have been a failure of duty had the agents not detained the Defendants and continued the investigation at this point. *United States v. Elmore*, 595 F.2d 1036 (5th Cir. 1979). The agents at this point knew that there was still an automobile outside with at least one adult occupant. The Court finds that it was entirely reasonable for the agents to continue the investigation with respect to the automobile. As stated in *United States v. Worthington*, 544 F.2d 1275 (5th Cir. 1977), it is the duty of officers to be alert for suspicious activities and to follow up with appropriate investigation within constitutional limits. At this point, the officers clearly had sufficient basis to believe that criminal activity was in progress.

Upon arrival at the automobile, Officer Vineyard found the motor running with an adult at the driver's seat. Immediately upon his tapping at the window and showing a badge, without any other force, the occupant commenced to exit from the automobile. The black plastic garbage bag containing the cocaine was in plain view. Officer Vineyard recognized the bag as the type that he had customarily seen used in drug cases during his seven years' experience. At that point, the Court believes that probable cause existed to believe that a crime was being committed and to justify the search of the vehicle. Moreover, exigent circumstances necessary to justify a warrantless search were present in view of the mobility of the vehicle. *United States v. Worthington, supra,* at 1280. Once the initial investigative stop is legally made, additional facts may develop and the suspicion may grow into probable cause. Under exigent circumstances, a search of the movable vehicle without a warrant is justified. *United States v. Hall*, 557 F.2d 1114 (5th Cir. 1977). *See also United States v. Mitchell*, 538 F.2d 1230 (5th Cir. 1976).

Defendant Medina-Martinez strongly urges that many of the legal authorities relied upon by the Government in this case are inapplicable because the contraband was discovered by State officers after Defendant Smith had been declared to be under arrest for failure to have a driver's license. It was clear from the evidence, however, that all of the officers, namely Pfeiffer, Vineyard and Glenn were working together on this case and that there had been some degree of communication between them. Under the circumstances, the Court can consider the cumulative knowledge of the officers working on the case rather than only the knowledge possessed by any single officer. *United States v. Michel*, 588 F.2d 986 (5th Cir. 1979); *United States v. Soto*, 591 F.2d 1091 (5th Cir. 1979). *See also United States v. Wright*, 588 F.2d 189 (5th Cir. 1979) where the collective knowledge of the officers was considered and where the Court also sets forth a collection of Supreme Court cases at footnote 4 to the effect that the Fourth Amendment affords motor vehicles somewhat less protection than that provided to other property on the basis that one has a lesser expectation of privacy in a motor vehicle.

In rendering this opinion, the Court is not unmindful of the decision in *United States v. Johnson*, 588 F.2d 147 (5th Cir. 1979), and candidly confesses some difficulty in weighing the applicability of that decision to the present case. There the Fifth Circuit found ample evidence to establish probable cause to seize luggage from an automobile without a warrant but not to search it. The Court relied upon the Supreme Court case of *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). In the *Johnson* case, the Court was concerned with canvas duffle bags which it characterized as "luggage". The *Chadwick* case involved a locked footlocker and the rationale of that opinion was that a person has substantial expectations of privacy in his personal luggage. In *Johnson*, the Fifth Circuit announced that its holding pertained to the searching of "luggage or similar personal property". 588 F.2d at 151. The question before this Court, therefore, is whether or not a small plastic garbage bag

**1140**

on the floor of the front seat of an automobile can be classified as personal property similar in kind to luggage and in which a person would normally have reasonable expectations of privacy. Without attempting at this time to determine the full breadth of the phrase "similar personal property" as used in *Johnson*, this Court finds that the black plastic garbage bag is not property similar in kind to luggage as contemplated by the decision in *Chadwick*.

The Motion to Suppress is overruled.

## FACTS SURROUNDING ARREST OF ROMERO–MORQUECHO AND SAENZ–DE LEON

At approximately 9:30 A.M. on May 12, 1979, DEA agent Jeff Wendling, stationed in Laredo, received information from his Dallas office that Defendant Ramon Medina-Martinez had four to five pounds of cocaine at his mother's residence at 418 West San Jose Street in Laredo. Wendling was also told that Medina-Martinez (who had already been arrested the prior day in Dallas) would attempt to have the cocaine removed. The information to this effect had been furnished DEA agents in Dallas by Defendant Smith, presumably after his own arrest. Wendling confirmed that the woman residing at 418 West San Jose Street, Maria Hinojosa, was the mother of Ramon Medina-Martinez. At approximately 3:15 P.M. on May 12, surveillance was established at the Hinojosa residence. Wendling briefed the two Texas Department of Public Safety officers who were to conduct the surveillance and he told them of the information he had obtained from Dallas.

Pursuant to the instructions from Wendling, Officer David A. Jalufka established surveillance at 418 West San Jose Street at 3:15 P.M. on May 12. He was accompanied by Trooper Allen Helt. At approximately 3:22 P.M., Jalufka saw two men come out of the house and enter a Chevrolet pick-up truck. The driver of the vehicle, Defendant Romero-Morquecho, was carrying an orange paper sack in his left hand and carried the sack into the vehicle. Defendant Saenz-De Leon entered the passenger side. The truck then proceeded in a westerly direction and Jalufka followed. The two men in the truck began to look back frequently to see if someone was following them and appeared to be carrying on an animated conversation. Suddenly the truck accelerated and cut through the driveway of a service station. It then began to travel at a high rate of speed and at one point "fishtailed". The officers followed in a chase that lasted seven or eight blocks with many different and frequent left and right turns being made. The officers kept the pick-up truck in view most of the time except for once when it was out of sight for almost a block. After pursuing seven or eight blocks, the officers commenced to flash their lights and honk their horn and the pick-up truck pulled over to the side and stopped. It was determined at this point that the orange paper bag was not in the truck and Romero-Morquecho denied any knowledge of the bag. In the bed of the truck, sitting in plain view, was a cardboard box with a set of scales and some plastic bags which apparently were empty. The box was marked "Triple Beam Scales". On the scales was the residue of white crystals. Later in the day Special Agent Cecil Hester retraced the route which had been traveled by the pick-up truck and eventually found the orange paper bag in a ditch on Maryland Avenue between Lane and Guerrero Streets. The bag was in a brush pile at about halfway down the ditch. Inside the paper bag was a plastic bag containing approximately ten ounces of cocaine.

## CONCLUSIONS OF LAW CONCERNING ARREST OF ROMERO–MORQUECHO AND SAENZ–DE LEON

■ The Court finds that there was sufficient grounds to stop and detain the pick-up truck based on the information received from Defendant Smith, the confirmation of the identity and address of Medina-Martinez' mother, the presence of two men departing the residence with an orange sack, the circuitous driving route at high speed and the information already known by the agents with respect to Medina-Martinez.

The tip from Smith purported to relate a fresh statement from Medina-Martinez which was clearly against his own penal interest. Whether or not Smith had ever previously furnished reliable information to the authorities is not controlling; moreover, the agents could consider the substance of the tip plus their own knowledge of the suspect's reputation. *United States v. Harris*, 403 U.S. 573, 580, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). Here the agents received a tip from an individual who had just been recently arrested as a result of a meeting and apparent transaction with Defendant Medina-Martinez, the tip purported to convey a declaration against penal interest from Medina-Martinez himself and the tip furnished details as to the address and the nature and amount of the contraband. The reputation of Medina-Martinez was already known to Wendling as it was his office which had furnished the tip to the Dallas DEA agents the day before. All of this taken together, along with the subsequent actions of Romero-Morquecho and Saenz-De Leon were sufficient to justify the stop. The subsequent absence of the orange bag and the disclaimer of any knowledge of same would in this Court's opinion furnish probable cause for a search of the vehicle.

The Court finds that the orange paper bag in question was voluntarily abandoned prior to its discovery and therefore Defendants have no standing to object to whatever search might have been conducted. *United States v. Colbert*, 474 F.2d 174 (5th Cir. 1973). Regardless of whether or not the Defendants had standing, however, the search was nevertheless valid and no warrant was required under the "Open Fields Doctrine". Search of open fields without a search warrant is not unreasonable and is not constitutionally impermissible. *United States v. Brown*, 473 F.2d 952 (5th Cir. 1973). Defendants suggest that these authorities are inapplicable unless it can actually be shown that the Defendants had possession of the object at the time it was abandoned. The evidence does show that the bag was placed in the truck at the house and was not found a few minutes later when the truck was stopped. It is true that the officers did not actually see the bag being discarded but the Court finds no authority requiring such evidence under the "Open Fields Doctrine". It would seem that an argument along these lines would go more to the weight and relevancy of the evidence than to its admissibility and certainly a jury could find that the bag found near the street with the cocaine was not the same bag originally brought into the truck by the Defendants. Such a determination should await trial on the merits.

Once the truck was stopped under the circumstances outlined above and once the bag was not located in the truck and the Defendant denied any knowledge of same, the officers had probable cause to inspect the truck. The scales in the box in the open bed of the truck would come within the plain view doctrine. *United States v. Pugh*, 566 F.2d 626 (8th Cir. 1977).

The Motion to Suppress is overruled.