**UNITED STATES of America**

v.

**Robert D. BLAIR, Charles L. Moore, Jr., William G. Dodds, Jr.**

**Crim. Nos. H–79–0235, H–79–0283.**

United States District Court, D. Maryland.

June 19, 1980.

---

Russell T. Baker, Jr., U. S. Atty., and Paul R. Kramer, Deputy U. S. Atty., Baltimore, Md., for the Government.

John K. Zwerling and Jonathan Shapiro, Alexandria, Va., for defendant Blair.

Robert G. Fierer, Atlanta, Ga., for defendant Moore.

J. Flowers Mark and William B. Moffitt, Alexandria, Va., for defendant Dodds.

Myron L. Wolfson, Baltimore, Md., for all defendants.

ALEXANDER HARVEY, II, District Judge:

This case represents another in a series of recent prosecutions brought by the federal government against individuals charged with smuggling marijuana into States of the Fourth Circuit by means of vessels operating in coastal waterways. *See* "High on the Seas: Drug Smuggling, The Fourth Amendment, and Warrantless Searches at Sea", 93 H.L.R. 725–751 (1980). Four of the five States in this Circuit are located along the Atlantic Seaboard and contain bays, rivers and other waterways which provide access to the ocean for the introduction of water-borne contraband into this country. Recent federal enforcement efforts have resulted in the seizures of a number of vessels in these waterways, and these seizures, in turn, have presented various Fourth Amendment questions to the District Courts and to the United States Court of Appeals for the Fourth Circuit.

*United States v. Coats*, 611 F.2d 37 (4th Cir. 1979), involved a fishing vessel seized by the Coast Guard in the Caribbean and later used to make a controlled delivery of marijuana in North Carolina. *United States v. Harper*, 617 F.2d 35 (4th Cir. 1980), dealt with other aspects of that prosecution. *United States v. Laughman*, 618 F.2d 1067 (4th Cir. 1980), involved a sailing vessel boarded by Custom officials in the intracoastal waterway near Charleston, South Carolina. In *United States v. Diaz-Segovia*, 457 F.Supp. 260 (D.Md.1978), charges of marijuana trafficking were brought following surveillance of high speed (or "cigarette") boats which left Ocean City, headed out into the ocean and returned. *See* 457 F.Supp. at 273–275.

The pending case arose as a result of the seizure in Maryland waters of the Potomac River of a sailing vessel loaded with 6½ tons of marijuana. The three defendants were on board at the time, and they have been charged with various violations of federal law in two separate indictments returned by separate grand juries in this District.

Besides filing a motion to suppress the evidence seized on the sailing vessel on Fourth Amendment grounds, defendants have also filed a motion to dismiss the indictments on the ground that the Jury Selection Plan for the District of Maryland is invalid. These are the only remaining motions still before the Court.[1] Extensive briefs and supporting papers have been

---

1. This Court has previously denied numerous other motions filed by the defendants, and has granted, with the consent of the defendants, the government's motion to destroy, following sampling, the 6½ tons of marijuana which was seized.

filed by the parties, and lengthy oral argument has been heard in open court. In addition, this Court has considered the Findings and Conclusions of Magistrate Frederic N. Smalkin, to whom this Court initially referred defendants' motion to suppress for the purpose of conducting an evidentiary hearing, pursuant to 28 U.S.C. § 636 and Local Rule 80. Both the government and the defendants have "appealed" from the Magistrate's Findings and Conclusions pursuant to former Local Rule 81(a).

## I

### The Indictments

On April 29, 1979, agents of the United States Customs Service and State and County law enforcement officers stopped, without a warrant, and boarded a 51-foot sailing vessel, the CENTAURUS, in the waters of the Potomac River about twenty miles south of Washington, D. C., within the jurisdiction of Charles County, Maryland. Finding the defendants on board as well as what they believed to be large quantities of marijuana, the agents and officers arrested the defendants and seized the vessel. The next day, the CENTAURUS was searched without a warrant, and the agents discovered that it had been transporting 6½ tons of marijuana. They also took into their possession other incriminating evidence.

On May 30, 1979, the Grand Jury for the District of Maryland returned a two-Count indictment in Criminal No. H–79–0235. The first Count charged that all three defendants had traveled in interstate commerce with the intent to further unlawful activity, in violation of 18 U.S.C. § 1952. The alleged unlawful activity was the possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The second Count charged defendants with unlawfully possessing with intent to distribute approximately 6½ tons of marijuana, in violation of 21 U.S.C. § 841(a)(1). In both Counts, all three defendants were charged both as principals and as aiders and abettors, under 18 U.S.C. § 2.

The term of the Grand Jury which returned that indictment expired in early June of 1979. Another Grand Jury was duly organized during that month to continue the investigation. On June 20, 1979, that second Grand Jury returned another indictment, in three Counts, which was docketed as Criminal No. H–79–0283 and which named as defendants the same three individuals indicted in Criminal No. H–79–0235. The first Count of the second indictment charged the defendants with a conspiracy to import marijuana, in violation of 21 U.S.C. § 963. The second Count charged defendants with a conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C. § 846. The third Count charged the defendants, both as principals and as aiders and abettors, with unlawfully importing marijuana, in violation of 21 U.S.C. § 952. With the consent of the parties, these two criminal actions were consolidated for all purposes by Order of Court entered on September 21, 1979. Thus, in this consolidated case, each of the three defendants has been charged with five separate marijuana offenses.

## II

### Procedural Background

Defendants originally filed a motion challenging the Jury Selection Plan of this District on June 6, 1979. At that time, the necessary investigation of the procedures employed in this District for selecting grand and petit juries had not been undertaken by defendants. With the consent of counsel for the government, this Court entered an Order on August 1, 1979, permitting designated persons of the National Jury Project to inspect and copy records maintained by the Clerk which were pertinent to the selection of grand and petit juries in this District. Defendants designated Roger Friedman, a member of the National Jury Project, to conduct this investigation.

Mr. Friedman and his associates proceeded to conduct an extensive study of this District's Jury Selection Plan. They reviewed all the jury records maintained by

the Clerk's office, as well as the computer programs operated by the General Services Administration and used in this District in connection with jury selection. After the completion of this extensive investigation, defendants filed, on November 9, 1979, an updated motion to dismiss the indictments because of the alleged improper selection of grand and petit jurors in this District. In support of this motion, defendants attached the affidavit of Roger Friedman, setting forth the results of his study and the conclusions which he had drawn from those results. Thereafter, statistical experts employed by the government also investigated jury selection procedures in this Court. In support of its opposition to the jury motion, the government has filed affidavits of Bert F. Green, Jr. and Gary D. Gottfredson, its statistical experts.[2]

Defendants filed their motion to suppress evidence on August 9, 1979. When it became apparent that a lengthy evidentiary hearing would be required at or about the same time that this Court was engaged in a long trial, the Court, with the consent of the parties, referred the motion to suppress to Magistrate Frederic N. Smalkin for the purpose of conducting an evidentiary hearing. An extensive evidentiary hearing, lasting from November 19 to November 21, 1979, was thereafter held before the Magistrate.[3]

Magistrate Smalkin filed his Findings and Conclusions on February 21, 1980. He recommended that the motion to suppress be denied as to the marijuana seized from the CENTAURUS and that it be granted as to certain photographs which had been made from an undeveloped roll of film found on board the vessel. A motion for reconsideration was denied by Magistrate Smalkin on March 12, 1980. Both the government and the defendants have appealed from the Magistrate's Findings and Conclusions, pursuant to Local Rule 81.

## III

### The Jury Selection Plan Challenge

The selection of juries in federal courts is governed by the provisions of the Jury Selection and Service Act of 1968, Pub.L.No. 90–274, which has been codified as 28 U.S.C. § 1861 et seq. (hereinafter "the Act"). The basic and underlying policy behind the Act was that all litigants in federal courts should have the right to grand and petit juries selected at random from a fair cross-section of the community in the District wherein the Court convened. 28 U.S.C. § 1861. The Act attempts to achieve this purpose by insuring that the source list for prospective jurors would reflect an adequate cross-section of the community and that no procedure would be employed which would impermissibly diminish the likelihood that a fair cross-section of the community would be attained. H.R.Rep.No.1076, 90th Cong., 2nd Sess., reprinted in [1968] U.S. Code Cong. & Admin.News, pp. 1792, 1794. The Act further specifically provides that "[n]o citizen shall be excluded from service as a grand or petit juror in the district courts of the United States on account of race, color, religion, sex, national origin, or economic status." 28 U.S.C. § 1862.

Pursuant to provisions of the Act, this District has adopted a formal Plan for the random selection of grand and petit jurors.[4] The Clerk of this Court was designated to manage the jury selection process under the supervision of the Jury Plan Judge. Originally adopted by this Court in 1968 and approved by a reviewing panel consisting of members of the Fourth Circuit Judicial Council and a judge of this Court, the Plan

---

2. Both sides agreed that the facts necessary for a decision on the pending jury motion were fully developed by the affidavits and exhibits filed herein and that no evidentiary hearing would be necessary.

3. The transcript of this hearing has been prepared, has been reviewed by the Court and is a part of the record in this case.

4. This "Plan of the United States District Court for the District of Maryland for the Random Selection of Grand and Petit Jurors" will be referred to hereinafter as "the Plan."

has been amended from time to time since then.

The Plan specifically states that voter registration lists represent a fair cross-section of the community in the District of Maryland, and the Plan relies upon voter registration lists as the sole source of names of prospective jurors, in accordance with 28 U.S.C. § 1863(b)(2). The names to be placed upon the Master Jury Wheel are drawn from the lists of registered voters of all the counties of Maryland and of Baltimore City in the manner described hereinafter.

By a separate Order, the Court establishes the number of names to be selected at random from the voter registration lists of each county and of Baltimore City to give that jurisdiction proportionate, or nearly proportionate, representation on the Master Jury Wheel. The Plan provides that at all times, the Master Jury Wheel shall contain no less than 1,000 names. The number of names to be drawn from each county and from Baltimore City is calculated by the Clerk by dividing the number of registered voters in each county or in the city by the total number of registered voters in the state and then multiplying these fractions by the number of names to be placed in the Master Jury Wheel. The results are the number of names to be drawn from each county and from Baltimore City. A ratio number is then selected to insure that the proper number of names are selected. A starting number is selected by randomly choosing a number between 1 and the ratio number. The first name on the list selected will be at the starting number and the remaining names will be at intervals equal to the ratio number.[5]

Once the Master Jury Wheel has been filled, the Clerk, from time to time as directed by the Court, publicly draws at random the names of as many persons as the Court shall direct. An alphabetical list of the names drawn, referred to as the "prospective juror list", is prepared by the Clerk. Every person whose name appears on the prospective juror list is mailed a copy of the Juror Qualification Questionnaire, which is required to be completed and returned to the Clerk. If a prospective juror fails to return this questionnaire, the Clerk may summon him or her to appear and fill out the questionnaire.

The returned questionnaires are used to determine which persons on the prospective juror list are in fact eligible for jury service. The Plan carefully defines those who may be excused, exempted and disqualified from jury service. Provided that the Jury Judge so determines, the Jury Plan automatically disqualifies any person who

(1) is not a citizen of the United States eighteen (18) years old who has resided for a period of one year within the State of Maryland;

(2) is unable to read, write and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the Juror Qualification Questionnaire form;

(3) is unable to speak the English language;

(4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service; or

(5) has a charge pending against him for the commission of, or has been con-

---

5. A simple example will illustrate this procedure. Assuming a district where the total number of registered voters is 6000, distributed among three counties as follows: County A—2250; County B—1750; and County C—2000, and assuming that the Court has established 1200 as the total number to be placed on the Master Jury Wheel, the number of names to be chosen from each such county would be:

$$\text{County A} = \frac{2250}{6000} \times 1200 = 450$$

$$\text{County B} = \frac{1750}{6000} \times 1200 = 350$$

$$\text{County C} = \frac{2000}{6000} \times 1200 = \underline{400}$$
$$\text{Total} \qquad 1200$$

The ratio number would be 5, obtained by dividing 1200 into 6000. The starting number would be obtained by placing the numbers 1, 2, 3, 4 and 5 in a box and selecting one at random. If the number 2 were chosen, then the 2nd, 7th, 12th, 17th, 22nd, etc. names from the registered voter list of each county would be placed on the Master Jury Wheel.

victed of, a crime punishable by imprisonment for more than one year, in a State or Federal Court of record, and his civil rights have not been restored.

The Jury Plan also exempts those persons who are:

(1) Members in active service in the Armed Forces.

(2) Employees of federal, state, county or municipal courts, or of probation, police or fire departments.

(3) Public officers in the executive, legislative or judicial branches of the Government of the United States, or of the State of Maryland, or of any county thereof, or of Baltimore City, who are actively engaged in the performance of official duties. "Public Officer" shall mean a person who is either elected to public office or who is directly appointed by a person elected to public office.

In addition, the Jury Plan establishes seven carefully defined classes or groups of individuals whose service would entail undue hardship or extreme inconvenience and who therefore would be entitled to be excused from jury service upon individual request. The two excuses relevant to the pending case are the child care excuse and the sole proprietor excuse. The child care excuse permits the excusing from jury service on request of

A person who in his or her household is solely responsible for the care of (a) one (1) or more children of twelve (12) years of age or under; or (b) one (1) or more persons, who by reason of mental or physical disability cannot be left safely alone while he or she would be performing jury service in this Court.

The sole proprietor excuse permits the excusing on request of

A person who, alone, or with one (1) other person, owns and operates his, her or their business and (a) who has three (3) or less employees (not including himself or herself); or (b) who has more than three (3) employees (not including himself or herself) but less than fifteen (15) employees and who is a person whose active participation is required in order for the business to be effectively operated.

The names of those persons who return the questionnaires and who are not disqualified, exempted or excused from jury service are then placed in the Qualified Jury Wheel. At least 750 names must be contained in this Wheel at all times. From the Qualified Jury Wheel, names are selected and jurors are summoned to appear in Court at the beginning of each of the four Terms of Court. The process for selecting names from the Qualified Jury Wheel is similar to the process for selecting names from the voter registration lists. Prior to each Term of Court, the Clerk publicly makes a random drawing of such numbers of names as the Jury Judge directs. A ratio number is computed and then a starting number is chosen at random, with the random selection then proceeding in open court.

In practice, however, the ratio numbers selected have been too small, with the result that too many names have been chosen from the Qualified Jury Wheel. Instead of eliminating the excess names in a random manner, the practice of the Clerk has been to program the computer so that the excess names at the bottom of the list are dropped. This practice has had the result of precluding those persons whose last names began with the letters X, Y and Z from being summoned for grand and petit jury service in this District.

Defendants contend that this District's Plan violates both the Constitution and the Act because it is not technically random and because black males, women, young persons between the ages of 18 and 29, non-federal employees and the less-advantaged are substantially underrepresented. Defendants also attack provisions of the Plan establishing a one-year residency requirement for jurors and permitting sole proprietors of small businesses to be excused. Since both the constitutional and the statutory standards for determining the validity of a jury selection plan are the same, *United States*

*v.· Test,*[6] 550 F.2d 577, 584 (10th Cir. 1976) (*en banc*), this Court will consider both claims together.

### (a) *The test*

■ In order to establish a prima facie case, defendants must prove (1) that the groups allegedly excluded are distinct groups in the community; (2) that these groups are not substantially represented on the juries or venires and that representation of them is not fair and reasonable in relation to the composition of the community; and (3) that the underrepresentation of these groups is due to systematic exclusion in the jury selection process. *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). Defendants concede that under this test they are not entitled to a jury or a jury venire which is a statistical mirror of the community from which it is drawn. *Swain v. Alabama,* 380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L.Ed.2d 759 (1965); *United States v. DiTommaso,* 405 F.2d 385, 389 (4th Cir. 1968). It is likewise not disputed that the burden of establishing a prima facie case rests upon the defendants in this case. *United States v. Smaldone,* 485 F.2d 1333, 1347 (10th Cir. 1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974).

■ This Court must first .determine whether any of the groups which are allegedly underrepresented on the juries or panels in this District are "distinct groups" within the community. The Tenth Circuit in *United States v. Test, supra* at 591, set forth the various characteristics which define a distinct group. A distinct group must possess

> (1) the presence of some quality or attribute which "defines and limits" the group; (2) a cohesiveness of "attitudes or ideas or experience" which distinguishes the group from the general social milieu; and (3) a "community of interest" which may not be represented by other segments of society.

550 F.2d at 591.

**6.** The *Test* case was cited with approval by the Fourth Circuit in *United States v. Coats, supra,* 611 F.2d at 41, n. 7.

### (b) *Age*

■ Under this test, both women and blacks are unquestionably distinct groups. *Taylor v. Louisiana,* 419 U.S. 522, 531–33, 95 S.Ct. 692, 698–699, 42 L.Ed.2d 690 (1975). However, those persons between the ages of 18 and 29 (or persons between any other selected ages) have never been so treated. The age parameters chosen by defendants are entirely arbitrary and are not an inherent attribute of the group. Defendants have offered no articulable reason for selecting the age of 29 as the cut-off point rather than some other age. Furthermore, defendants have not shown on the record here that this group possesses a cohesiveness of attitudes which would create a distinct group. This Court is in full agreement with the conclusion reached by every Court which has addressed this issue that age alone does not define a distinct group. *See, e. g., United States v. Potter,* 552 F.2d 901, 905 (9th Cir. 1977); *United States v. Test, supra* at 591; *United States v. DiTommaso, supra* at 391; *United States v. Diaz-Segovia,* Crim.No. N–78–0307, slip op. at 15 (D.Md.Sept. 13, 1978). This Court therefore finds and concludes that persons between the ages of 18 and 29 are not a distinct group within the community. Accordingly, defendants have not made out a prima facie case of the Plan's invalidity insofar as it applies to those persons.

### (c) *Non-federal employees*

At oral argument, defendants conceded that non-federal employees are not a distinct group in the community. This Court so finds. There could hardly be a cohesiveness of attitudes or ideas or experience of such a large class of individuals as all employed persons in the State who do not work for the federal government.

### (d) *Black males*

Defendants contend that black males are disproportionately excluded from jury ser-

vice in this District (1) because voter registration lists are the sole source of names of prospective jurors and black males do not register to vote in as high a proportion as other groups of the community, and (2) because black males fail to respond to mail questionnaires in disproportionate numbers and the Clerk makes no attempt to follow up on these unreturned questionnaires. These contentions are without merit.

It is doubtful that black males constitute a distinct group within the community. Certainly, blacks in general would meet the requirements outlined in the *Test* case, but it is not clear why blacks of both sexes should not be considered in determining whether there has been underrepresentation of a racial group under a particular jury plan. Defendants have not cited and this Court has not been able to find any cases which hold that black males are a distinct group as opposed to blacks in general. In this case, defendants have been compelled to claim underrepresentation merely of black males under the Plan because studies of their own expert indicates that non-white females are slightly overrepresented on both the Master Jury Wheel and the Qualified Jury Wheel. Since this Court has concluded in any event that black males are not disproportionately excluded from jury service in this District, it is not necessary to determine whether black males would constitute a distinct group within the community.

█ The Jury Selection and Service Act of 1968 specifically requires that voter registration lists be used as the primary source for names of prospective jurors. 28 U.S.C.

§ 1863(b)(2). The use of voter registration lists has been consistently upheld against both statutory and constitutional challenge, unless the voter list in question had been compiled in a discriminatory manner.[7] *United States v. Dellinger*, 472 F.2d 340, 366 (7th Cir. 1972); *Wilkins v. Maryland*, 402 F.Supp. 76, 78 (D.Md.1975). Congress recognized that the use of voter registration lists in this manner would exclude from jury service those individuals who do not register to vote. However, Congress concluded that such exclusion would not be unfair since no economic or social characteristic would prevent a person from placing his name on the voter registration list. H.R.Rep.No. 1076, 90th Cong., 2nd Sess., *reprinted in* [1968] *U.S.Code Cong. & Admin.News,* pp. 1792, 1794–95. Thus, the mere underrepresentation of black males on voter registration lists is not sufficient to establish a violation of the Act or of the Constitution. *United States v. Briggs*, 366 F.Supp. 1356, 1358–61 (N.D.Fla.1973).

In any event, this Court concludes that black males are not substantially underrepresented on Maryland voter registration lists. Defendants' expert performed a random sampling of the returned Juror Qualification Questionnaires in order to determine the percentage of black males on the voter registration lists.[8] Defendants' expert concludes that black males comprise 5.1% of Maryland voter registration lists.[9] According to 1970 Census data,[10] black males comprise 8.0% of the population of Maryland. Therefore, the absolute disparity of black males on the voter registration lists is only –2.9% and the comparative dis-

---

7. Defendants do not contend that the Maryland voter registration laws are discriminatory.

8. In its proposed findings of fact, the government agrees that this statistical sampling would adequately reflect the true composition of the Master Jury Wheel. Since the Master Jury Wheel in turn reflects the true composition of Maryland voter registration lists, defendants' statistical study would be acceptable for the purpose of reflecting the composition of Maryland voter registration lists.

9. If this Court were to accept defendants' further contention that black males constituted a

disproportionate number of the persons who failed to return jury questionnaires, then this figure would be understated, and black males would constitute an even greater percentage of the voter registration lists.

10. Defendants have also submitted data from a 1975 Maryland State Planning Department study. There is little difference in the two sets of data, and the parties agree that both sets of data are essentially accurate. For the sake of convenience, this Court will refer only to the 1970 Census data.

parity is −36.0%.[11] Insofar as these figures are concerned, defendants' expert computed the standard deviation as 1.21 and the statistical disparity as −2.39. According to the affidavits of the expert, these computations indicate that, in a statistical sense, the juror selection system in Maryland did not operate in a purely random fashion. However, these figures do not establish that black males are in a legal sense substantially underrepresented on the voter registration lists or on the Master Jury Wheel. In this case, statistical significance and legal significance are not the same. *United States v. Test, supra* at 589. Defendants are entitled to be indicted by and tried by a grand and petit jury representing a "fair" cross-section of the community; there is no constitutional or statutory requirement that these juries be ideal or perfect cross-sections of the community from which they are drawn.

Neither Congress nor the courts have established an *a priori* figure for determining when a distinct group is substantially underrepresented in the jury pool. Because the factual situation will vary from district to district, the determination of what constitutes substantial underrepresentation necessarily must be made on a case by case basis. *United States v. Test, supra* at 589.

In deciding whether the underrepresentation of black males shown by defendants' figures would be legally substantial, this Court has looked at decisions of other courts involving distinct groups of approximately the same size as that involved in this case. In *United States v. Test,* 399 F.Supp. 683, 687 (D.Colo.1975), Chicanos constituted 8.89% of the general population, but constituted only 4.81% of the jury pool. The District Court, calculating the absolute disparity as −4.08% and the comparative disparity as −46%, held that neither figure constituted substantial underrepresentation. *United States v. Test, supra,* 399 F.Supp. at 697. The Tenth Circuit affirmed, *en banc.* 550 F.2d 577.

In *Swain v. Alabama, supra,* black males comprised 26% of all the males in the population but, on the average, only 10 to 15% of the jury panels. The maximum absolute disparity was −16% and the maximum comparative disparity was −61%. The Supreme Court held that these disparities did not violate the Sixth Amendment. Compared to these figures which were deemed to be legally insubstantial, the absolute and comparative disparities between the percentage of black males in the Maryland population and the percentage of black males on Maryland voter registration lists are insignificant. Accordingly, this Court finds and concludes that insofar as a purported distinct group of black males is concerned, Maryland voter registration lists represent a fair cross-section of the community in this District and that there is accordingly no need to supplement the voter registration lists by the use of other sources. *United States v. Brady,* 579 F.2d 1121, 1131 (9th Cir. 1978).

Defendants next contend that black males were substantially underrepresented on the Qualified Jury Wheel because the Clerk did not attempt to follow up on those persons who did not return the Juror Qualification Questionnaire.[12] Defendants argue that since a disproportionate number of black males fail to return these questionnaires, the Clerk's failure to follow up on the unreturned questionnaires systematically excluded black males from jury service. This contention is without merit. Defendants' own expert calculated that black males constitute 7.7% of the Qualified Jury Wheel. The absolute disparity is therefore

---

**11.** Absolute disparity equals the percentage of the group on the voter registration list minus the percentage of the group in the entire population. Comparative disparity is the absolute disparity divided by the percentage of the group in the entire population. In *United States v. Maskeny,* 609 F.2d 183, 190 (5th Cir. 1980), the Fifth Circuit declined to consider comparative disparity figures and found that the absolute disparities disclosed by the record in that case did not make out a constitutional violation.

**12.** Approximately 80% of the Juror Qualification Questionnaires mailed out by the Clerk are returned either entirely or partially completed.

only –0.3%. This minor underrepresentation is totally insignificant as a matter of law.[13] Since any lack of follow-up effort on the part of the Clerk did not result in any substantial underrepresentation of black males, the Clerk was not required to undertake further efforts. *United States v. Armsbury*, 408 F.Supp. 1130, 1143–44 (D.Or. 1976).

#### (e) *Women*

Defendants also contend that women are substantially underrepresented on the Qualified Jury Wheel because of provisions of the Plan permitting a person charged with the care of young children to be excused. This Court would disagree.

 According to 1970 Census data, women constitute 51.4% of the population of Maryland. The Qualified Jury Wheel is composed of 48.3% women. The absolute disparity is –3.1% and the comparative disparity is –6.1%. Such figures do not constitute substantial underrepresentation. *See United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir. 1980). In any event, underrepresentation of women because of the narrowly drawn child-care exemption in this District's Plan does not violate either the Constitution or the Jury Selection and Service Act. *United States v. Cohen*, 275 F.Supp. 724, 740 (D.Md.1967), *aff'd sub nom. United States v. DiTommaso, supra; United States v. Armsbury, supra* at 1144. These cases recognize that a jury plan may validly permit those charged with the care of young children to be excused on individual request.

#### (f) *The less advantaged*

Next, it is contended by defendants that the "less advantaged" members of the community are underrepresented on the Qualified Jury Wheel. Defendants define "less

advantaged" as including factors relating to both employment and education.

 Statistics supplied by the defendants' expert disclose that the absolute disparity for the unemployed is –11.0% and the comparative disparity is –34.3%; that the absolute disparity for those not graduating from high school is –5.9% and the comparative disparity is –23.6%; and that the absolute disparity for service workers is –1.7% and the comparative disparity is –20.5%. However, no figures have been supplied to show what would be the results if an arbitrary classification of unemployed service workers who had not graduated from high school were to be considered a distinct group under the *Test* formulation.[14] The figures which have been supplied do not amount to substantial underrepresentation of the so-called "less advantaged" on this Court's Qualified Jury Wheel. *United States v. Test, supra; Swain v. Alabama, supra.*

#### (g) *Sole proprietors*

 Defendants also challenge provisions of the Plan permitting the sole proprietor of a business to be excused from jury service. However, this excuse is drawn very narrowly and exempts from jury service only the sole owner of a small business or a person who owns a small business with only one other person. A small business is defined as one with less than three employees or as one with less than fifteen employees if the owner's active participation is required in order for the business to be effectively operated.

Narrowly drawn excuses of this sort have consistently been approved by the Courts. *United States v. Test, supra*, 550 F.2d at 594–95. This Court would agree with those decisions which have found entirely reason-

---

**13.** This Court would note that black males constitute a higher proportion of the Qualified Jury Wheel (7.7%) than of the Master Jury Wheel (5.1%). The system of filling the Qualified Jury Wheel apparently favors black males rather than excluding them.

**14.** *Once again, it is highly doubtful that the persons arbitrarily classified by defendants as "less advantaged" would possess sufficient cohesiveness of attitude or ideas or experience to be converted into a distinct group.* However, in view of the conclusion reached by the Court herein, it is not necessary to decide this question.

able the presumption of hardship and inconvenience which the Plan attaches to the sole proprietor group. *United States v. Grey,* 355 F.Supp. 529, 531 (W.D.Okl.1973).

(h) *The one-year residency requirement*

■ Likewise, defendants' challenge to this District's one-year residency requirement for jury service is without merit. *See Wilkens v. Maryland, supra* at 78; *United States v. Arnett,* 342 F.Supp. 1255, 1260 (D.Mass.1970).

### (i) *Randomness in general*

Finally, defendants contend that the selection of panels from the Qualified Jury Wheel was not accomplished in a random fashion because when the Clerk obtained too many names, the excess names at the end of the list were simply dropped. This process resulted in the exclusion of those persons whose last names began with the letters "X", "Y", and "Z".

■ The experts agree that the operation of the jury system in this manner is not statistically random. However, defendants have not established that the practice substantially excluded a distinct group or that a fair cross-section of the community was not obtained when names beginning with twenty-three of the twenty-six letters of the alphabet were used for the selection of juries in this District. On the contrary, the record in this case convinces this Court that this District's Plan does provide a fair cross-section of the community. Although this Court does not endorse the practice which effectively excludes persons whose names begin with the last three letters of the alphabet and would suggest that some other system be used by the Clerk to eliminate excess names, so long as the practice does not prevent a fair cross-section of the com-

munity from serving as jurors, it does not violate defendants' rights under the Constitution or under the statute. *See Krause v. Chartier,* 406 F.2d 898, 901 (1st Cir. 1968).

■ Defendants have further argued that the combination of the deficiencies claimed to exist indicate that this Jury Plan does not provide jurors who are properly representative of the community, particularly since there is a three-month jury term for jurors in this Court.[15] But whether defendants' claims are considered singly or in combination, the record here does not establish any substantial underrepresentation of any group which would require the use of sources other than voter registration lists to insure that juries were composed of a fair cross-section of the community.[16] Defendants have relied on publications which advocate measures to achieve an ideal jury plan. But neither the Act nor the Constitution require that a District's plan be ideal or a perfect statistical mirror of the community. *Swain v. Alabama, supra,* 380 U.S. at 208, 85 S.Ct. at 829; *United States v. DiTommaso, supra* at 389.

On the record here, this Court finds and concludes that this District's Jury Plan satisfies statutory and constitutional requirements. Accordingly, defendants' pending motion to dismiss the indictments will be denied.

### IV

*The Motion to Suppress*
(a) *Standard of review*

[17] Defendants and the government agree that in reviewing the Magistrate's Findings and Conclusions filed in this case, the standard is one of *de novo* review. 28 U.S.C. § 636(b)(1); Local Rule 82(e).[17] This

---

**15.** Although other courts have employed a one-month or even a lesser term for jury service, the record here does not establish that this Court's three-month term, which has operated satisfactorily since the 1968 Act was passed, is invalid in any way.

**16.** Counsel have been unable to cite any case decided since the 1968 Act in which a federal court has held that the use of voter registration lists was inadequate and that alternative sources should have been employed.

**17.** Both the government and the defendants filed "appeals" to the undersigned Judge from the proposed Findings of Fact and recommendations of the Magistrate, pursuant to former Local Rule 81(a). This Court's Local Rules were amended effective April 1, 1980. The applicable provision is now Local Rule 82(e), which more properly characterizes the challenge to a Magistrate's finding as an "objection."

Court may accept, reject or modify in whole or in part the Findings and recommendations of the Magistrate. Local Rule 82(e). The Court may, but is not required to, receive further evidence on the issues, and the Court's Findings and Conclusions may be based entirely upon the record presented before the Magistrate. *See United States v. Whitmire*, 595 F.2d 1303, 1305 (5th Cir. 1979); Local Rule 82(e).

In the Findings and Conclusions he filed in this case on February 21, 1980, Magistrate Smalkin recommended that the defendants' motion to suppress evidence seized from the CENTAURUS be denied as to all items except for the negative and positive images later developed from film taken in the search. In view of the very complete evidentiary hearing held before the Magistrate, it is not necessary for this Court to receive further evidence on the issues presented.

### (b) *Findings of Fact*

With the few exceptions to be noted below, the government and defendants do not dispute the Findings of Fact made by the Magistrate. These Findings are set forth hereunder.

In the early morning hours of April 29, 1979, officers of the Charles County Sheriff's Department observed several suspicious motor vehicles, including trucks and a van, at Smith Point, which is located in that County on the Potomac River. In December 1978, the same officers had found marijuana residue at the same location in a stolen waterman's workboat. The motor vehicles they saw in April 1979 were open and, observing what they believed to be marijuana residue, the officers suspected that these vehicles were similarly engaged in marijuana smuggling. On the ground near the vehicles were fuel cans, a generator, a vacuum cleaner, a large tarpaulin, a hand truck, a locked black trunk and other items. From their own experience and based on smuggling profiles, the officers suspected that unknown persons were engaged in smuggling operations.

The officers also observed some indentations in the sand which indicated that several people had recently run from the area. Surveillance of the area was then established, and one of the officers later stopped a suspicious gray Oldsmobile on a nearby road. When the operator of the vehicle was unable to produce any identification and when the officer observed what appeared to be marijuana residue in the automobile, the operator was placed under arrest.

About four or five hours later, the officers spotted a sailboat anchored in the Potomac River off Smith Point and thinking that it might be connected with the vehicles discovered earlier that morning, the vessel was placed under surveillance. When this boat, the EUREKA, later raised its anchor and proceeded north under power, State officers of the Natural Resources Police (formerly the Maryland Marine Police) were contacted. The EUREKA was then intercepted by these State officers and when a registration violation was found, the occupants were taken into custody. With the consent of the occupants, the boat was searched, but no marijuana or other contraband was found on board.

At 10:30 A.M. that same morning, federal Customs Patrol Officers ("CPOs") Bass and Jungerheld met with County Deputy Sheriffs and the State Natural Resources Police. Federal law enforcement officers had been assigned to this Charles County area, and local, State and federal officers had been cooperating in the investigation of smuggling operations conducted by means of vessels operating in the Potomac River. The meeting on the morning of April 29, 1979 was held in the office of the Charles County Sheriff. While the meeting was under way, a waterman named Davis telephoned CPO Bass and told him about a suspicious-looking vessel located off Thomas Point, which is near Smith Point. CPO Bass had previously met Davis, had familiarized him with the warning signs of smuggling operations,

and had requested that he call if he saw suspicious activity on the water. Davis reported that the vessel he saw was a three-masted sailboat towing a dinghy and that it was sitting unusually low in the water, especially in the bow. Five people were on board, but four of them went below deck when Davis approached.

The officers then obtained a police boat and set off in pursuit of the vessel. All of the officers had been informed of the suspicious circumstances observed earlier that same morning on shore. A State Police helicopter then joined the search. The helicopter reported that only two vessels on the Potomac River fitted the description given, but neither had three masts. The officers thereupon contacted Davis by radio, and he stated that he could have mistaken rigging on the boat he saw for an extra mast and that the boat he saw could have had two masts instead of three. Davis also stated that the boat was white with a dark stripe.

The officers first approached the nearest and smaller two-masted sailboat, but when one of the Deputy Sheriffs recognized the family on board, they broke off contact and went on to try to locate the second and larger vessel. They then approached the other boat, the CENTAURUS, a 51-foot Morgan, at about 2:15 P.M. Since it was heading in a direction opposite to that originally reported by the helicopter, the officers initially passed at a distance of approximately a quarter mile and searched the entire surrounding area to determine if there were any other vessels in the area fitting the description given. When none were sighted, the officers approached the CENTAURUS, which almost completely matched the amended description given by Davis. The vessel was white with a dark stripe, was low in the water and was pulling a dinghy. The police boat then pulled alongside the CENTAURUS with a Deputy Sheriff stationed in the bow with his shotgun held at "port arms."

As the two vessels came abreast, defendant Dodds, located aboard the CENTAURUS, raised his hands and said "Don't shoot, we are unarmed, we don't have any guns; you have got us." Immediately prior to boarding, Natural Resources Police Officer Sciukas detected the odor of marijuana and, concerned about his safety, told defendant Dodds that he was coming on board to make a safety inspection. Officer Jungerheld also smelled marijuana after he came aboard the vessel. Once on board, the officers could see through an open hatchway numerous bales of suspected marijuana located below deck. The bales were in cardboard boxes, most of which had been taped shut, and the vessel was loaded with these boxes from stem to stern. Having made these observations, the officers then placed under arrest all three defendants who were on board.

The CENTAURUS was then taken to the Naval Ordnance pier where it was unloaded on April 30, 1979, the next day. Although the Magistrate did not specifically so find, the record establishes, and this Court finds, that during unloading operations the officers observed that several of the boxes were split and broken open so that marijuana was in view. No search warrant was obtained to search either the vessel or the boxes, but after unloading, several of the boxes were opened and found to contain marijuana. Also found on board was a camera containing a roll of exposed but undeveloped film. When the film was later developed by the Charles County Sheriff's Department, the prints disclosed scenes which, according to the government, implicate the defendants in the marijuana smuggling scheme charged.

Although both sides agree with the essential Findings of Fact made by the Magistrate, the defendants do challenge four specific Findings: (1) that Officer Sciukas detected the odor of marijuana before boarding the CENTAURUS; (2) that Officer Sciukas was concerned for his own safety when he said he was making a "safety check"; (3) that defendant Dodds said "You have got us" when the police boat pulled alongside; and (4) that bales of marijuana were in plain view on the vessel. After a review of the record in this case and in particular the entire transcript of the evi-

dentiary hearing held before the Magistrate, this Court finds each of these objections to be without merit. The relevant Findings made by the Magistrate will therefore be confirmed and adopted by this Court as its own, subject to the modification previously mentioned.

Magistrate Smalkin accepted the testimony of Officer Sciukas that he smelled the odor of marijuana as soon as he began to board the CENTAURUS. This occurred before he was actually on the deck of the vessel. Defendants argue that Officer Sciukas may have thought that he smelled marijuana but that in actuality it was physically impossible for him to detect the odor of marijuana. After consideration of the transcript, this Court finds, as did the Magistrate, that the testimony of defendants' expert in psychopharmacology was unconvincing. Defendants and their expert make various contentions concerning the direction of the wind at the time, which they claim would not have made it possible for the officer to then smell marijuana. Based on the meterological reports and all the other evidence, this Court finds, as did the Magistrate, that the wind was blowing in a direction and that the boat was headed in a direction which would have permitted Officer Sciukas to smell marijuana as he testified he did. A very large quantity was on board, over 6½ tons, and it was later determined that some of the boxes were split and broken open. On the record here, this Court finds that Officer Sciukas did in fact smell the odor of marijuana while he was in the process of boarding the CENTAURUS and before he actually came on board.

Defendants' second objection is to the Magistrate's Finding that Officer Sciukas was concerned for his safety and therefore announced that he was making a "safety check." But this particular Finding is not relevant to the legal conclusions reached by this Court. Since neither the government nor the Magistrate has attempted to justify the boarding or search of the CENTAU-RUS as a safety inspection, it is not necessary to rule upon this objection.

Defendants' third objection is to the Finding that defendant Dodds raised his hands when the police boat approached and stated: "Don't shoot, we are unarmed, we don't have any guns; you have got us." Defendants assert that only Corporal Hutchinson could remember these precise words and that the other officers could remember only parts of the statement. But the fact that other witnesses did not remember the statement in precisely the same terms as did Corporal Hutchinson hardly indicates that the testimony is not credible. Indeed, had all the witnesses attributed the exact same words to defendant Dodds, the testimony would be suspect. Both CPO Bass and CPO Jungerheld heard defendant Dodds say something to the effect of "We've got no weapons on board, you've got us." Testimony of the other Officers thus supports that of Corporal Hutchinson, and there is nothing in the record to contradict what he said.[18] On the record here, this Court accepts the Magistrate's Finding as to the statements made by defendant Dodds, and this Court adopts that finding as its own.

Finally, defendants object to the Magistrate's Finding that once on deck, Officer Jungerheld "could readily view bales of marijuana." Defendants argue that since the marijuana was wrapped in burlap and placed inside cardboard boxes, Officer Jungerheld could not have known what the boxes contained.

However, the transcript makes it quite clear that Officer Jungerheld, once on deck, was in a position to view the boxes stowed in the area below deck. At that time, he had knowledge of the suspicious circumstances that had led to the stopping of the vessel, he had heard the statement of defendant Dodds, he had smelled marijuana and he had viewed a very large number of boxes loaded on board the vessel. These facts were certainly sufficient for him to

---

**18.** Defendant Blair was the only one of the defendants to testify, and he did not contradict the Officer's testimony in this regard.

conclude that these were "bales of marijuana." On the record here, this Court finds that Officer Jungerheld, once on deck, could readily view the bales and determine that they were bales of marijuana.

### (c) *Conclusions of Law*

In determining whether defendants' constitutional rights were violated by the warrantless search of the CENTAURUS and its contents, the facts of this case require that this Court engage in a three-step analysis and answer the following questions: (1) Did the officers have a reasonable suspicion to justify the stop and the boarding of the CENTAURUS? (2) Did the officers have probable cause to search the CENTAURUS? (3) Was the warrantless search justified by exigent circumstances?

### (1) *The stop of the CENTAURUS*

 If a law enforcement officer has a reasonable suspicion that an individual may be involved in the commission of a crime, the officer may briefly stop that individual in order to make limited inquiries. *Terry v. Ohio*, 392 U.S. 1, 23, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). In *United States v. Brignoni-Ponce*, 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–2581, 45 L.Ed.2d 607 (1975), the Supreme Court extended this principle to investigative stops of automobiles by roving border patrols. The Court stated (at pages 881–82, 95 S.Ct. at page 2580):

> * * * in appropriate circumstances the Fourth Amendment allows a properly limited "search" or "seizure" on facts that do not constitute probable cause to arrest or to search for contraband or evidence of crime. In both *Terry* and *Adams v. Williams* the investigating officers had reasonable grounds to believe that the suspects were armed and that they might be dangerous. The limited searches and seizures in those cases were a valid method of protecting the public and preventing crime. In this case as

well, because of the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives for policing the border, we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion.

The Fourth Circuit has very recently recognized that these same principles apply to the stopping of a sailing vessel suspected of marijuana trafficking in an area far removed from the international border. *United States v. Laughman, supra,* at 1073, n.5.

 In this case, the totality of the circumstances amply justified the officers in having a reasonable suspicion to believe that the CENTAURUS was engaged in marijuana smuggling. First, an off-loading site on shore had been discovered where items associated with an illegal smuggling operation had been found. Next, an experienced waterman had observed a large sailing vessel in the vicinity which was riding extremely low in the water and the occupants of which were acting in a suspicious manner. Only two large sailing vessels were then observed in the Potomac River, and only one, the CENTAURUS, closely matched the amended description provided by the waterman. The combination of all these facts created a reasonable suspicion of illegal activity which justified the stopping of the CENTAURUS.[19]

Defendants contend that the stop of the CENTAURUS was not a proper investigatory stop because the officers intended from the outset to search for evidence of a crime, and not merely to make a limited inquiry. This novel argument has no support in the case law. The only case cited by defendants in support of its contention is *United States v. Hammack*, 604 F.2d 437, 440 (5th Cir. 1979), where the Court stated:

---

**19.** Defendants have also argued that even if the officers had the right to make a *Terry*-type stop of the vessel, they had no right to come on board. However, it is not necessary to decide

this question. As discussed hereinbelow, probable cause to board and search the vessel arose *before* the officers stepped on the deck of the CENTAURUS.

As we construe *Terry* and its progeny, the critical factor in evaluating the validity of a stop is the motivation of the officer involved. Crucial to this determination is the testimony of that officer as to the reasons for making the stop.

However, a close reading of the opinion reveals that when the Court mentioned the motivation of the police officer, it was referring merely to *Terry*'s standard of reasonable suspicion. The arresting officer in that case testified that he had no reasonable suspicion to believe that the defendant there had committed a crime and that the only purpose for stopping him was to ascertain his identity. The Court accordingly concluded that the arresting officer's motive for making the stop was solely to identify the defendant and was not based upon a reasonable suspicion that a crime was being committed. Under such circumstances, the Court ruled that the stop was illegal under *Terry*.

█ In this case, the officers did have reasonable suspicion to make the stop. It is clear that they intended to ascertain whether the persons aboard the CENTAURUS were engaged in a narcotics smuggling operation, a legitimate purpose under both *Terry* and *Brignoni-Ponce*. Even if the officers had intended from the outset to act beyond the proper bounds of an investigative stop, such intent would not vitiate the validity of the stop so long as the facts are sufficient to support a reasonable suspicion in the officer's mind of criminal activity. *Diamond v. Marland*, 395 F.Supp. 432, 443 (S.D.Ga.1975). Since the officers did not *act* beyond the bounds of *Terry* when they stopped the CENTAURUS, defendants' constitutional rights were not violated by any unexpressed intent of the officers concerning acts to be undertaken by them *after* the stop. Indeed, to hold otherwise would subvert the principle that the validity of an investigatory stop is to be determined by objective factors, and not by the good faith or bad faith of the arresting officers. *See Terry v. Ohio, supra* at 21, 88 S.Ct. at 1879.

### (2) *Probable cause to search*

█ As Officer Sciukas began to board the CENTAURUS but before he stepped on the vessel's deck, he detected the odor of marijuana. Since Officer Sciukas is a trained law enforcement officer who is able to recognize the distinctive odor of marijuana, probable cause arose at the moment he recognized the odor and prior to actual boarding. *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948); *United States v. Mullin*, 329 F.2d 295 (4th Cir. 1964).

Moreover, defendant Dodds, before the vessel was boarded, made the inculpatory statement "You've got us." In addition, the officers were then in possession of all the facts which this Court has found amounted to reasonable suspicion of criminal activity.

█ When the odor of marijuana, the inculpatory statement of Dodds and the other circumstances which led up to the stopping of the CENTAURUS are considered in their totality, this Court concludes that the facts here were sufficient to constitute probable cause for the arrest of the defendants and the search of the CENTAURUS even before the officers stepped on the deck of the vessel.

### (3) *Exigent circumstances*

█ Since probable cause alone is not sufficient to justify a warrantless search, this Court must go on to consider the third question posed. A warrantless search is deemed to be *per se* unreasonable unless certain narrowly defined exigent circumstances are present. *Johnson v. Wright*, 509 F.2d 828 (5th Cir. 1975). Because of the inherent mobility of an automobile and the great difficulties presented for adequately securing a motor vehicle and its contents, it has long been recognized that a warrant is not required to search a motor vehicle. *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Similarly, a boat is also extremely mobile and is not easily secured. Therefore, a warrant is not generally required for

the search of a boat. *See, e. g., United States v. Laughman, supra*; *United States v. Kleinschmidt*, 596 F.2d 133, 136 (5th Cir. 1979); *United States v. Whitmire*, 595 F.2d 1303 (5th Cir. 1979); *United States v. Miller*, 589 F.2d 1117, 1125, n.3 (1st Cir. 1978). In *United States v. Laughman, supra* at 1073, the Fourth Circuit specifically held that a search of a vessel such as this one without a warrant is justified by the exigent circumstances arising out of the mobility of the vessel.

■ Defendants contend that since the CENTAURUS was taken to the Naval Ordnance Pier and not searched until approximately eighteen hours later, it was unreasonable not to obtain a search warrant. However, the courts have consistently held that a warrantless search of a lawfully impounded motor vehicle does not violate the Fourth Amendment if there is probable cause. *Weaver v. Williams*, 509 F.2d 884, 886 (4th Cir. 1975). This Court can discern no reason why a distinction should be made between a lawfully impounded automobile and a lawfully impounded boat.

Defendants also argue that the officers should have obtained a warrant before opening the taped cardboard boxes. In support of their position, defendants rely upon *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), and *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). In both cases, the Supreme Court held that the defendants' personal luggage could not be searched without a warrant when the luggage was within the exclusive custody of the police. These holdings were premised upon the high expectation of privacy associated with personal luggage and a lack of exigent circumstances which would justify an immediate search.

In support of its ruling in the *Sanders* case, the Supreme Court observed that "luggage is a common repository for one's personal effects, and therefore inevitably associated with the expectation of privacy." *Arkansas v. Sanders, supra* at 762, 99 S.Ct. at 2592. The Court went on to state that it was holding "only that a warrant is required before personal luggage can be searched and that the extent to which the Fourth Amendment applies to containers and other parcels depends not at all upon whether they are seized from an automobile." *Arkansas v. Sanders, supra* at 765, n. 13, 99 S.Ct. at 2594 n.13. As Justice Blackmun presciently noted in his dissent: "Still hanging in limbo, and probably soon to be litigated, are the briefcase, the wallet, the package, the paper bag, and every other kind of container." *Arkansas v. Sanders, supra* at 768, 99 S.Ct. at 2595.

A number of cases involving warrantless searches of these other types of containers have now been decided by the various Circuits. In general, these decisions have held that a warrant is required only if the defendant had a reasonable expectation of privacy in the package or container which was searched. *See, e. g., United States v. Ross*, No. 79–1624, slip op. at 15 (D.C.Cir. Apr. 17, 1980); *United States v. Dien*, 609 F.2d 1038, 1045 (2d Cir. 1979); *United States v. Gooch*, 603 F.2d 122, 127 (10th Cir. 1979); *United States v. Neumann*, 585 F.2d 355, 360–61 (8th Cir. 1978).

■ In the pending case, this Court concludes that defendants did not have a reasonable expectation of privacy in the cardboard boxes containing the bales of marijuana. Unlike one or two pieces of personal luggage, a large number of identical cardboard boxes, stowed on board a vessel as cargo, would not inevitably be associated with an expectation of privacy since containers of this sort do not generally serve as a repository of personal effects. Containers of the sort involved in this case offer only minimal protection against accidental or deliberate intrusions, and their contents are much more likely to become subject to public display than if the same items had been placed in personal luggage. *See United States v. Ross, supra*, slip op. at 14-15. In fact, before the boxes were opened, it was observed that a number of them were split and broken open. The officers were therefore able to see as well as smell the marijuana during unloading and before opening some of the boxes.

Moreover, the number and condition of the boxes indicated that they were not being used as receptacles for private items. There were over 300 boxes packed into the hold of the CENTAURUS from stem to stern, and a strong odor of marijuana was emanating from them. Once the officers were on board, the boxes were readily visible through the vessel's hatches, and it could be seen that they were cargo. The mere taping of the boxes shut was not sufficient to create a reasonable expectation of privacy in these containers which were clearly cargo. It has been held that *Sanders* does not apply to a cargo of marijuana visible through the open door of a private airplane. *United States v. Gooch, supra* at 126–27; *see, also, United States v. Morquecho*, 474 F.Supp. 1134 (S.D.Tex. 1979).

Defendants' reliance upon *United States v. Dien, supra*, is misplaced. In *Dien*, the Court found that the defendants manifested an expectation of privacy by sealing certain boxes with tape, painting over the windows of their van and separating the driver's seat from the cargo area by a piece of plywood. In the pending case, defendants had taped the boxes but had made no further efforts to manifest an expectation of privacy. The hatches of the vessel were open so that anyone standing on deck could readily observe the many containers stowed below. Also, during unloading, it was observed that several boxes had broken open, and marijuana was in view. *Chadwick* and *Sanders* do not apply if a container is partially open and incriminating materials are in plain view. *United States v. Pugh*, 566 F.2d 626 (8th Cir. 1977).

Under all these circumstances, this Court finds and concludes that exigent circumstances existed to permit the search of the vessel and that defendants did not have a reasonable expectation of privacy in the boxes opened. Accordingly, no search warrant was required for a search of either the vessel or the boxes.

(4) *Development of the film*

In his Findings and Conclusions, the Magistrate recommended that the motion to suppress should be granted as to the photographs developed from the exposed roll of film found on board the CENTAURUS. He concluded that the film was a *res* in connection with which the defendants had a legitimate expectation of privacy. In so ruling, the Magistrate declined to follow *United States v. Hilton*, 469 F.Supp. 94 (D.Me.1979), which held that individuals arrested aboard a yacht who did not express a possessory or proprietary interest in a roll of undeveloped film found on board did not have standing to object to the later inspection of the film. The *Hilton* case was decided before *Arkansas v. Sanders, supra*, and the Magistrate reasoned that the District Judge's decision had been based upon an erroneous anticipation of the Supreme Court's decision in *Sanders*.

Shortly after the Magistrate filed his Findings and Conclusions, the First Circuit affirmed the decision in *Hilton*, specifically holding that the defendants had no standing to object to the inspection of the film. *United States v. Hilton*, 619 F.2d 127 (1st Cir. 1980). That opinion, which was authored by Circuit Judge Campbell and which was decided after *Sanders*, is a carefully reasoned and convincing one with which this Court would agree. In this case, as in the *Hilton* case, none of the defendants, either at the time of the seizure or at the evidentiary hearing held before the Magistrate, asserted any proprietory or possessory interest in the film seized. Although the roll of undeveloped film in this case may be a protected *res* under the rule in *Arkansas v. Sanders, supra*, these defendants are not necessarily the ones entitled to assert that protection. Since the defendants here have not established in support of their motion to suppress that they have a possessory or proprietary interest in the film, they lack standing to challenge the validity of the development of the film. *See Rakas v. Illinois*, 439 U.S. 128, 130–31 n.1, 99 S.Ct. 421, 423–424, 58 L.Ed.2d 387 (1978).

For these reasons, the motion to suppress the film will also be denied.

## V

*Conclusion*

For the reasons stated, defendants' motion to dismiss the indictments and defendants' motion to suppress will both be denied.